**PUBLIC VERSION**

CHR. BJELLAND SEAFOODS A/S (NOW NORWEGIAN SALMON A/S), *ET AL.*, PLAINTIFFS *v.* UNITED STATES, *ET AL.*, DEFENDANTS, AND COALITION FOR FAIR ATLANTIC SALMON TRADE, DEFENDANT-INTERVENOR

Court No. 91–05–00364

(Dated January 18, 1995)

*Mudge Rose Guthrie Alexander & Ferdon (N. David Palmeter, Jeffrey S. Neeley),* for plaintiffs.

*Frank W. Hunger,* Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice *(A. David Lafer);* Office of the Chief Counsel for Import Administration, United States Department of Commerce *(Robert J. Heilferty),* of counsel, for defendant.

*Lyn M. Schlitt,* General Counsel; *James A. Toupin,* Assistant General Counsel, United States International Trade Commission *(Marc A. Bernstein),* for defendant.

*Collier, Shannon, Rill & Scott (Michael J. Coursey, Robin H. Gilbert),* for defendant-intervenor.

MEMORANDUM OPINION

GOLDBERG, *Judge:* Plaintiffs, Norwegian Salmon A/S *et al.*, commenced this action under section 516A of the Tariff·Act of 1930, challenging: the final affirmative injury determination made by the U.S. International Trade Commission ("ITC") in *Fresh and Chilled Atlantic Salmon from Norway,* USITC Pub. No. 2371, Inv. Nos. 701–TA–302 and 731–TA–454 (Final) (Apr. 1991); the final affirmative antidumping ("AD") determination made by the U.S. Department of Commerce, International Trade Administration ("Commerce") in *Fresh and Chilled Atlantic Salmon from Norway,* 56 Fed. Reg. 7661 (Feb. 25, 1991); Commerce's final affirmative countervailing duty ("CVD") determination in *Fresh and Chilled Atlantic Salmon from Norway,* 56 Fed. Reg. 7678 (Feb. 25, 1991); and the antidumping and countervailing duty orders entered therefrom. By order dated October 23, 1992, the court remanded this action with instructions that the ITC reevaluate its material injury determination in accordance with the court's opinion. *Chr. Bjelland Seafoods A/S (Now Norwegian Salmon A/S) v. United States,* 16 CIT 945 (1992) *("Salmon I").* The court reserved decision on its review of plaintiffs' challenges to Commerce's AD and CVD determinations, pending the results of remand to the ITC. *Salmon I,* 16 CIT at 946.

The ITC issued its final affirmative injury determination on April 1, 1991 *("April 1991 ITC Determination").* Pursuant to this court's order of remand, the ITC issued its remand determination on December 22,

1992. *Fresh and Chilled Atlantic Salmon From Norway,* USITC Pub. No. 2589, Inv. Nos. 701–TA–302 and 731–TA–454 (Final) (Remand) (Dec. 1992) *("ITC Remand Results").* By a three to three vote, the ITC reaffirmed its affirmative finding of material injury.[1] Plaintiffs now challenge the ITC's remand determination. The court exercises its jurisdiction pursuant to 28 U.S.C. § 1581(c) (1988).

## I. BACKGROUND

The factual predicate underlying this action is detailed in the court's original memorandum opinion. *Salmon I,* 16 CIT at 946–48. Briefly, the product covered by the contested orders is whole or nearly-whole Atlantic salmon that is typically, but not necessarily, marketed gutted, bled, and cleaned, with the head on, and packed in fresh-water ice ("Norwegian salmon"). The challenged orders do not cover fillets, steaks, or other cuts of Atlantic salmon, or frozen, canned, smoked or otherwise processed Atlantic salmon. *Initiation of Antidumping Duty Investigation: Fresh and Chilled Atlantic Salmon from Norway,* 55 Fed. Reg. 11,418, 11,419 (Mar. 28, 1990); *Initiation of Countervailing Duty Investigation: Fresh and Chilled Atlantic Salmon from Norway,* 55 Fed. Reg. 11,423 (Mar. 28, 1990).

The Atlantic salmon industry operates on a three year production cycle. Salmon eggs are hatched and the salmon are grown through their fry and parr stages in fresh water tanks; after approximately eighteen months, the salmon "smoltify." The smolt are placed in large ocean pens or cages, where they grow to market size adult fish over a period of eighteen to twenty-four months. Harvesting begins in late summer or early fall and continues until the following late spring or early summer.

## II. DISCUSSION

In this review, the court is charged to hold unlawful any agency determination that is not supported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is more than a mere scintilla; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rhone Poulenc, S.A. v. United States,* 8 CIT 47, 50, 592 F. Supp. 1318, 1321 (1984) (citation omitted). The court will thus sustain agency determinations if they are reasonable and supported by the record as a whole, even though portions of the record may detract from the substantiality of the evidence. *Atlantic Sugar, Ltd. v. United States,* 2 Fed. Cir. (T) 130, 136, 744 F.2d 1556, 1563 (1984).

The court must accord substantial weight to an agency's interpretation of the statute it administers. *American Lamb Co. v. United States,* 4 Fed. Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986) (citations omitted). This deference, however, "is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors of the Fed. Reserve Sys. v.*

---

[1] When the Commissioners on the ITC are evenly divided as to whether a determination should be affirmative or negative, the ITC is deemed to have made an affirmative determination. 19 U.S.C. § 1677(11) (1988).

*Dimension Fin. Corp.,* 474 U.S. 361, 368 (1986). Thus, the court should not defer to an agency's interpretation where "there are compelling indications that that interpretation is incorrect." *Borlem .S.A.-Empreedimentos Industriais v. United States,* 8 Fed. Cir. (T) 164, 168, 913 F.2d 933, 937 (1990). Neither should the court defer to an agency's determination that is based on inadequate analysis. *USX Corp. v. United States,* 11 CIT 82, 88, 655 F. Supp. 487, 492 (1987).

A. *The ITC's Final Affirmative Injury Determination on Remand*

In an AD or CVD investigation, the ITC is charged with determining whether an industry in the United States is either materially injured, or threatened with material injury, by reason of subject imports.[2] 19 U.S.C. §§ 1671d(b)(1), 1673d(b)(1) (1988). There are two components to an affirmative determination: a finding of present material injury or a threat thereof, and a finding of causation. Plaintiffs challenge the ITC's remand determination as to both components.[3]

The ITC found that the domestic industry experienced present material injury based upon: declining smolt shipments; marginal growth in the capacity utilization rate for smolt; lower average unit value of salmon shipments; and poor financial indicators. *ITC Remand Results* at 6–8. Although the ITC's reliance upon average unit value data is misplaced in this case,[4] the court finds that the administrative record does contain substantial evidence to support a finding of present material injury.

The ITC plurality also determined that subject imports are a cause of present material injury based upon: the absolute volume of subject imports during the POI; the increasing volume of subject imports from 1987–1989; early record evidence of price suppression and depression; and, record evidence of actual and potential negative effects on the domestic industry. The court finds that the plurality's conclusions regarding the significance of both the 1987–1989 increase in import volume, and the early price effects of subject imports, are unsupported by substantial evidence in the record; nevertheless, because the plurality's conclusions regarding the significance of both absolute volume data and evidence of the adverse impact of subject imports on the domestic industry are supported by substantial record evidence and in accordance with law, the court sustains the plurality's affirmative determination upon

---

[2] According to statute, in order to make this determination, the ITC:
    (i) shall consider—
        (I) the volume of imports of the merchandise which is the subject of the investigation,
        (II) the effect of imports of that merchandise on prices in the United States for like products, * * *
        (III) the impact of imports of such merchandise on domestic producers of like products, but only in the context of production operations within the United States; and
    (ii) may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports.
19 U.S.C. § 1677(7)(B) (1988).

[3] None of the Commissioners made an affirmative threat determination, in either the *April 1991 ITC Determination* or upon remand The court's review is thus limited to the ITC's affirmative present material injury determination.

[4] *See infra* part II.A.1.

remand.[5] The court will examine the plurality's analysis of each of the statutory factors in turn.

1. *Volume of Subject Imports*

In evaluating the volume factor, the ITC must consider whether the volume of subject imports, or any increase in such volume, is significant. 19 U.S.C. § 1677(7)(C)(i). The ITC determined that subject imports amounted to 7.6 million kilograms in 1987; 8.9 million kilograms in 1988; 11.4 million kilograms in 1989; and 7.7 million kilograms in 1990. *April 1991 ITC Determination* at A–43. In its final determination, the ITC placed great emphasis on the 1987–1989 volume data, but assigned "less weight to the recent decline in imports in 1990 because it appear[ed] to be largely the result of the filing of the petition and/or the imposition of provisional * * * duties."[6] *Id.* at 17. Plaintiffs argued that the decline in Norwegian imports in 1990 was not attributable to the presumptive effect of the imposition of provisional CVD and AD duties, but rather to the appreciation of the Norwegian kroner against the U.S. dollar. The appreciation of an exporting country's currency against that of the importing country will result in a lower volume of exports to the extent that such currency appreciation is manifested in a price increase, which in turn depresses consumption. The ITC plurality nevertheless found the volume of subject imports, and particularly the increase reflected in the 1987–1989 volume data, to be significant. *Id.* at 18.

Upon review, the court determined that the ITC had failed to adequately explain its conclusion that the 1990 decline in volume was not due to appreciation of the Norwegian kroner. *Salmon I,* 16 CIT at 952. The court also found that the ITC had failed to address record evidence of an increase in Norwegian imports to the European Community ("EC"), despite the fact that similar AD proceedings were underway there at about the same time. *Id.* Finally, the court faulted the ITC for not discussing the experience of the Norwegian exporter Sea Star International ("Sea Star") during a period in which its export shipments to the United States were not subject to provisional duties. *Id.* The court therefore ordered a remand, directing the ITC to address these deficiencies in a reevaluation of its volume determination.

Upon remand, the ITC continued "to accord little weight to the sharp decline in the volume of subject imports in the second half of 1990, because [the ITC found] it was in significant part attributable to the pendency of [the AD and CVD] investigations." *ITC Remand Results* at 14. The court finds that the ITC's position is unsustainable in this regard because it is not supported by substantial evidence in the record. There are four elements to the court's analysis of this issue.

---

[5] *Cf. Iwatsu Elec. Co. v. United States,* 15 CIT 44, 51, 758 F. Supp. 1506, 1512–13 (1991) (questioning whether causation may ever be proven by volume data alone).

[6] A provisional CVD, equal to 0.77 Norwegian kroner ("NOK") per kilogram, was imposed in late June 1990. *Fresh and Chilled Atlantic Salmon from Norway,* 55 Fed. Reg. 26,727, 26,732 (June 29, 1990). Provisional AD duties, which ranged from 1.6 percent to 4.9 percent *ad valorem* for those Norwegian firms found to be engaging in more than *de minimis* LTFV sales, were imposed in early October 1990. *Fresh and Chilled Atlantic Salmon from Norway,* 55 Fed. Reg. 40,418, 40,421 (Oct. 3, 1990).

*First,* the court notes that, in concluding that the decline in the volume of salmon imports from Norway in 1990 was not related to the decline in the value of the dollar relative to the kroner, the ITC based its analysis upon average unit value data. The ITC used average unit value statistics compiled by the Customs Service as a proxy for the merchandise's transaction value[7] in a comparison with prices charged by U.S. wholesalers of the subject imports.[8] During the period May 1990 through September 1990, the kroner appreciated 6.1 percent against the dollar.[9] *ITC Remand Results* at 11. During the same period, the average unit value of subject imports increased by 3.9 percent[10] while the prices charged by U.S. importers of Norwegian salmon increased by 14.3 percent for 2–3 kg salmon; 14.0 percent for 3–4 kg salmon; and 15.0 percent for 4–5 kg salmon. *Id.* at 11–12. The ITC concluded that because Norwegian exporters' prices were increasing at a lesser rate than the rate of currency appreciation, while the prices charged by U.S. importers were increasing at a rate greater than that of the kroner's appreciation against the dollar, such appreciation was not the cause of the sharp decline in volume. *Id.* at 12.

The court finds the ITC's analysis deficient in one major respect; specifically, the average unit value data relied upon by the ITC fails to account for shifts in the distribution of subject imports among different weight classifications. The ITC acknowledges that masked shifts in product mix undermine the reliability of the average unit value data. *ITC Remand Results* at 11 n.50. The ITC asserts, however, that it "took special precautions to guard against the average unit value statistic being skewed by changes in product mix[    ]" by limiting the scope of its analysis to the period May through September 1990. *ITC Brief on Remand* at 18. To establish the sufficiency of its lone precautionary measure, the ITC relies upon *AR List 2R,* Doc. No. 29, for the proposition that subject import product mix did not materially change during this period. *Id.* at 18–19. As this document clearly indicates, however, aggregate monthly shifts in product mix (measured in absolute terms) averaged approximately [    ] percent for the period May through September 1990; moreover, these shifts generated a downward bias in average unit value data which is unaccounted for by the ITC plurality in its

---

[7] Transaction value is defined as "the price actually paid or payable for the merchandise when sold for exportation to the United States" plus certain charges or costs not otherwise included in the price actually paid. 19 U.S.C. § 1401a(b)(1) (1988).

[8] *Defendant United States International Trade Commission's Opposition To Plaintiff's Motion For Judgment Upon The Agency Record On Remand* at 18 *("ITC Brief on Remand").*

[9] Commissioner Brunsdale noted that between January and December 1990, the Norwegian kroner appreciated 15 percent against the U.S. dollar, much of that appreciation occurring in the latter half of the year. *April 1991 ITC Determination* at 34 (Acting Chairman Brunsdale, dissenting).

[10] In support of this figure, the ITC refers the court to *Administrative Record ("AR") List 2,* Doc. No. 26C. Plaintiffs assert that this document does not constitute record evidence of the 3.9 percent figure cited by the ITC because it does not include average unit values. Plaintiffs fail to note, however, that Document No. 26C contains both total quantity and total value import data. In May 1990, imports of Norwegian salmon to the United States amounted to [          ] kg, at a total value of [          ] dollars. This results in an average unit value of [          ] per kilogram. In September 1990, imports of the subject merchandise amounted to [          ] kg, at a total value of [          ] dollars. This results in an average unit value of [          ] per kilogram, and reflects a 3.9 percent increase over the figure for May 1990.

remand determination.[11] The plurality's failure to adequately address this bias is inexplicable given that the administrative record contains an internal ITC memorandum which recognizes the legitimacy of such a concern.[12] The *ITC Internal Memorandum* notes that [                    ]. The memorandum further questions the use of subject import average unit value data by noting that [                    ]. This too was left unaddressed by the ITC plurality. In light of these significant omissions, a review of the administrative record leads the court to conclude that the plurality's decision to employ average unit values for the period May through September 1990 as an accurate proxy for prices paid by U.S. importers of Norwegian salmon is unsupported by substantial evidence.

*Second,* after rejecting kroner appreciation as the principal cause of the price increases implemented by U.S. importers during 1990, the ITC plurality concluded that the true impetus was the posting of bonds necessitated by the imposition of a provisional CVD in late June 1990. *ITC Remand Results* at 12. As a result of Commerce's preliminary CVD determination, beginning on June 29, 1990, importers were required to post a bond sufficient to cover a maximum potential CVD liability of 2.45 percent *ad valorem.* 55 Fed. Reg. 26,727 (June 29, 1990). From July through September 1990, this was the sole remedial duty imposed upon the subject imports. *See* 56 Fed. Reg. 7678 (Feb. 25, 1991); 55 Fed. Reg. 40,418 (Oct. 3, 1990). During this period, monthly wholesale market prices for Norwegian salmon increased by 13.39 percent for 2-3 kg salmon; 10.86 percent for 3-4 kg salmon; and 11.76 percent for 4-5 kg salmon.[13] The plurality's analysis thus leaves price increases of 10.94 percent for 2-3 kg salmon; 8.41 percent for 3-4 kg salmon; and 9.31 percent for 4-5 kg salmon, unaccounted for and attributable to something else. In other words, over seventy-five percent of the price increases which occurred during the period July through September 1990 are attributable to something other than Commerce's preliminary CVD determination.[14] The bonding requirement thus hardly merits the

---

[11] The following summary regarding imports of salmon from Norway is drawn from information contained in *AR List 2R,* Doc. 29:

| Monthly interval | Changes in distribution of imports (percent) | | | Aggregate absolute shift (percent) |
|---|---|---|---|---|
| | 4-6 lbs. | 6-9 lbs. | 9-11 lbs. | |
| May to June 1990. ........ | [    ] | [    ] | [    ] | [    ] |
| June to July 1990. ........ | [    ] | [    ] | [    ] | [    ] |
| July to August 1990. ...... | [    ] | [    ] | [    ] | [    ] |
| August to Sept. 1990. ..... | [    ] | [    ] | [    ] | [    ] |
| May to Sept. 1990. ........ | [    ] | [    ] | [    ] | |

The summary indicates that during the period May through September 1990, [                    ]. This relative shift to lower priced imports results in a downward bias in average unit value data over this period. This shift is not surprising given the pricing pressure attributable to appreciation of the Norwegian kroner during 1990.

[12] *AR List 2R,* Doc. No. 30 *("ITC Internal Memorandum")* is an internal memorandum from the Acting Chief of the Applied Economics Division of the ITC to the Commission.

[13] These figures are derived from public information summarized in *AR List 2R,* Doc. No. 28, Appendix 12, which is contained in the administrative record on remand.

[14] Even if the 3.9 percent increase in average unit values which occurred between May and September 1990 is taken into account, over half of the increase in U.S. wholesalers' prices still remains unaccounted for.

plurality's characterization as the "principal reason" for the disparity between increases in the average unit value of the subject imports and U.S. importers' price increases. *ITC Remand Results* at 12.

To buttress its conclusion, however, the plurality states that "[c]ontemporaneous reports in trade publications indicate that some U.S. importers were moving away from handling Norwegian salmon because of administrative and financial burdens associated with the posting of bonds." *Id.* The only record evidence cited in support of this statement is a single press report published in June 1990.[15] The report states, in pertinent part: "There appears to be some movement—mostly by smaller players—away from Norwegian fish because of the 'logistical hassles' involved with the bond." (Emphasis omitted). The record is devoid of subsequent press reports which address these associated "hassles." This lone excerpt from an industry newsletter, which was published four days *prior* to the Federal Register notice effectuating the bonding requirement, and which is unsubstantiated by *any* corroborating evidence in the record, does not amount to substantial evidence that the bonding requirement caused a reduction in the volume of Norwegian salmon exports to the United States. Moreover, this excerpt provides absolutely no evidence of the claimed financial burdens relied upon by the ITC plurality in its remand determination. For these reasons, the court concludes that the ITC's determination that the CVD bonding requirement was the principal cause of U.S. importers' 1990 price increases is unsupported by substantial evidence in the record.

*Third,* the court is unable to sustain the ITC plurality's conclusion regarding the experience of one Norwegian exporter in particular, i.e. Sea Star. During the period November 1990 through January 1991, unlike all other Norwegian exporters, Sea Star's export shipments to the United States were not subject to any provisional duties.[16] Despite its unique status as the sole exporter of Norwegian salmon free of provisional CVD and AD duties, Sea Star's exports to the United States during this period plummeted.[17] Clearly, this decline in export volume cannot be attributed to the imposition of provisional duties which did not apply to Sea Star. The plurality dismissed such record evidence, however, stating that "[a]n examination of Sea Star's U.S. export data indicates that its export decline does not track those of other Norwegian

---

[15] *Seafood Trend* (June 25, 1990). This report, located in *AR List 1* of the administrative record, is identified as Doc. No. 188(Y)(19). The court notes that in its response brief following remand, defendant states that this report "is far from the only material in the record that supported the Commission's conclusion." *ITC Brief on Remand* at 24. Defendant then proceeds to refer the court to monthly import statistics compiled by the Customs Service as that additional evidence. The cited statistics show "that there was a significant decline in subject import volume levels" during the latter half of 1990. *Id.* at 25. But this does not constitute record evidence of the *cause* of the decline in volume; rather, it merely evinces the fact that such a decline did occur, thus begging the question as to what specifically precipitated the decline.

[16] Sea Star was the one Norwegian exporter that was preliminarily found by Commerce not to be engaging in more than *de minimis* LTFV sales. 55 Fed. Reg. 40,418, 40,421 (Oct. 3, 1990). All other Norwegian exporters were subject to provisional AD duties, effective October 3, 1990. *Id.* With regard to the provisional CVD, Commerce terminated suspension of liquidation on October 28, 1990 in accordance with the GATT Subsidies Code, thereby eliminating the CVD bonding requirement. 56 Fed. Reg. 7678 (Feb. 25, 1991)

[17] Compared to the same month during the previous year, Sea Star's exports to the United States [                    ]. *AR List 2,* Doc. No. 10, at 63 *("Norwegian Respondents' Prehearing Brief").*

producers and cannot be attributed to the kroner appreciation." *ITC Remand Results* at 13. The plurality justifies its position merely by noting that [                    ]. Standing alone, such data simply fail to address the precipitous decline in Sea Star's exports during the relevant three month period, i.e. November 1990 through January 1991. What is significant here is that Sea Star's exports did track those of other Norwegian exporters during a period in which Sea Star alone had unencumbered access to the U.S. market. The plurality's remand determination fails to provide an adequate explanation of this phenomenon, nor is it explained by record evidence of provisional CVD and AD duties.[18] As a result, the court finds that the plurality's conclusion that Sea Star's export volume decline cannot be attributed to kroner appreciation is unsupported by substantial evidence in the record.

*Fourth,* the ITC plurality found that "[t]he fact that the volume of Norwegian exports to the [EC] did not similarly decrease during the pendency of an antidumping investigation there between December 1989 and March 1991 does not detract from [its] conclusion [that the decline in exports of Norwegian salmon to the United States was not principally a function of kroner appreciation]." *ITC Remand Results* at 13. The plurality based its finding on the fact that, in contrast to the instant U.S. investigations, provisional duties were not imposed in the EC investigation and therefore could not have acted as a deterrent to EC importers of Norwegian salmon. *Id.* This distinction notwithstanding, the court is unable to sustain the plurality's treatment of this issue. As noted, the plurality's analysis leaves over 75 percent of the price increases implemented by U.S. importers of Norwegian salmon between July and September 1990 unaccounted for, at a time when the kroner was appreciating sharply against the U.S. dollar.[19] During the pendency of the EC's AD investigation between December 1989 and March 1991, in the absence of any provisional duties, exports of Norwegian salmon to the EC increased by 20.4 percent while the kroner either maintained a steady exchange rate or even depreciated slightly against the currencies of its major customers in the EC.[20] The plurality thus dismissed the EC data solely on the basis of provisional U.S. duties which represent only a fraction of the price increases implemented by U.S. importers, and despite the fact that Norwegian salmon became substantially more expensive for U.S. customers in comparison to EC customers. This treat-

---

[18] The plurality also observes that Sea Star was one of eight exporters examined by Commerce, and accounted for less than [ ] of total export volume for the portion of the POI for which complete data are available. *ITC Remand Results* at 13–14. But this observation has nothing to do with why Sea Star's exports declined from November 1990 through January 1991. Indeed, the plurality's remand determination fails to offer any explanation for Sea Star's export volume decline, let alone for why it "cannot" be traced to appreciation of the Norwegian kroner.

[19] The real value of the Norwegian kroner appreciated by over 6 percent against the U.S. dollar between June and September 1990. *April 1991 ITC Determination* at A–64, Table 22.

[20] *ITC Remand Results (Dissent)* at 2 n.4 (Vice Chairman Watson and Commissioners Brunsdale and Crawford, dissenting); *April 1991 ITC Determination* at 34 (Acting Chairman Brunsdale, dissenting) . In 1990, Norway's five largest markets in the EC, by volume, were: France (30.3%); Denmark (20.2%); Spain (9.3%); Germany (9 2%); and the United States (8.1%). *Plaintiffs' Reply To Defendant's And Defendant-Intervenor's Opposition To Plaintiffs' Motion For Judgment Upon The Agency Record On Remand* at 14 n.26. From June to November 1990, the kroner depreciated 1.6 percent against the French franc. *Id.* n.27.

ment of the EC data is simply unsupported by substantial evidence in the record.

As the court recognized in its first opinion, plaintiffs have rebutted the presumption that the 1990 decline in exports of Norwegian salmon to the United States was due to the imposition of provisional CVD and AD duties. *Salmon I,* 16 CIT at 951–52. The court finds, for the foregoing reasons, that the ITC has failed to support with substantial record evidence its remand determination that this volume decline is not significant and merits diminished weight. Consequently, in light of this most recent record evidence, the court finds that the ITC's conclusion that the 1987–1989 increase in volume is significant for purposes of its present material injury inquiry is unsupported by substantial evidence and thus cannot be sustained.[21]

## 2. *Price Effects of Subject Imports:*

In evaluating the effects of subject imports on prices, the ITC is instructed to consider whether there has been significant price underselling of the imported merchandise in the United States, and whether subject imports have caused significant price suppression or depression for like product in the U.S. market. 19 U.S.C. § 1677(7)(C)(ii) (1988). The ITC originally determined that subject imports significantly depressed and suppressed prices for domestic like product. *April 1991 ITC Determination* at 20. In reaffirming its affirmative determination upon remand, the ITC plurality reiterated its belief that "the most current reliable import pricing information is for the period ending June 1990." *ITC Remand Results* at 16. The plurality therefore declined to accord the post-June 1990 data any probative value. As the court has previously discussed, however, this decision is unsupported by substantial evidence in the record. The court will thus consider the entirety of the record in its review of the plurality's conclusions regarding price effects.[22]

---

[21] Apart from its treatment of the decline in import volume, the ITC also concluded that the absolute volume of imports was significant throughout the POI for purposes of establishing a causal link to the depressed condition of the U.S. industry. *ITC Remand Results* at 14. Plaintiffs agree that "even at their sharply reduced volume, Norwegian imports were significant and, indeed, at all relevant times, supplied a larger share of the market than the domestic product." *Plaintiffs' Memorandum In Support Of Motion For Judgment Upon The Agency Record On Remand ("Plaintiffs' Brief on Remand")* at 19. The court finds that this aspect of the ITC's determination is supported by substantial evidence in the record.

[22] In remanding this matter to the ITC, the court noted that the Commission is responsible for determining whether subject imports are causing a domestic industry to suffer *present* material injury. *Salmon I,* 16 CIT at 952–54. The court did no more than accord a plain reading to 19 U.S.C. §§ 1671d(b)(1) and 1673d(b)(1). *See Salmon I,* 16 CIT at 952–54. Upon remand, several of the Commissioners expressed reservations regarding the court's discussion of the present material injury inquiry. *ITC Remand Results* at 15 n.61, 16 n.64; *ITC Remand Results (Dissent)* at 11–13 & nn.32–33 (Vice Chairman Watson and Commissioners Brunsdale and Crawford, dissenting). These concerns warrant further clarification.

As the ITC plurality observed, "the Commission's inquiry requires a dynamic analysis over a period of time of both the condition of the domestic industry and the effects of imports upon that industry." *ITC Remand Results* at 16 n.64. It is of course well within the ITC's discretion to discount or dismiss incomplete or unreliable data. A determination of present material injury does not require the ITC to collect and examine data up until vote day, or to focus exclusively upon data most nearly contemporaneous with vote day, without considering whether the reliability of such data is suspect. Indeed, as the court noted, provisional AD or CVD orders may be presumed to distort the meaningfulness of subsequent observable data. *See, e.g., Matsushita Elec. Indus. Co. v. United States,* 6 CIT 25, 34, 569 F. Supp. 853, 862 (1983), *rev'd on other grounds,* 3 Fed. Cir. (T) 44, 750 F.2d 927 (1984). As the court has explained, however, substantial

44

The ITC plurality based its finding of price depression and suppression upon: (1) the significant volume of subject imports during 1989 and the first half of 1990; (2) the fact that, due to conditions of competition, domestic producers could not withhold product from the market; (3) the fact that domestic like product and Norwegian salmon are highly substitutable; and, (4) the fact that during 1989 and the first half of 1990, prices for both subject imports and domestic like product, which generally moved in tandem, evince a downward trend. *ITC Brief on Remand* at 31. The court finds that the four points cited by the ITC plurality do not constitute substantial record evidence that subject imports depressed and suppressed prices for domestic like product sufficient to support an affirmative *present* material injury determination; rather, subsequent record evidence left unaddressed by the ITC plurality simply refutes all inferences that subject imports are a "present" cause of price depression and suppression in the domestic market.

As Acting Chairman Brunsdale aptly noted, "[t]he single most important fact in this case is that, even as the price of Norwegian fish became higher and higher in 1990, the price of domestically produced fish did not similarly increase. Instead, imports of Atlantic salmon from other nations skyrocketed." *April 1991 ITC Determination* at 28–29 (Acting Chairman Brunsdale, dissenting). The ITC plurality, however, fails to provide an adequate explanation for why domestic producers sold like product at an increasing discount relative to decreasing volumes[23] of

record evidence clearly refutes such a presumption in this case. Nor is the ITC required to base its determination of present material injury upon inferences about a period most nearly contemporaneous with vote day, during which time data cannot, as a practical matter, be collected.

In making a present material injury determination, the ITC is, however, required to account for reliable record evidence of changed circumstances which occur between the date of the petition and vote day and which impact a present material injury inquiry. *Accounting for changed circumstances in an assessment of whether a domestic industry is experiencing "present" material injury accords with the purely remedial purpose of our trade laws. See Chaparral Steel Co. v. United States*, 8 Fed. Cir. (T) 101, 108–09, 901 F.2d 1097, 1103 (1990) (citing S. Rep. No. 249, 96th Cong., 1st Sess. 39, 87 (1979)). As this court has recognized, the AD and CVD statutes are not penal, retaliatory, or compensatory. *See, e.g., National Knitwear & Sportswear Ass'n v. United States*, 15 CIT 548, 558, 779 F. Supp. 1364, 1372 (1991) (citations omitted); *National Ass'n of Mirror Mfrs. v. United States*, 12 CIT 771, 774, 696 F. Supp. 642, 645 (1988) (citation omitted). Rather, they are intended to equalize particular competitive conditions between foreign exporters to the United States and the domestic industry. *Imbert Imports, Inc. v. United States*, 67 Cust Ct. 569, 576 n.10, 331 F. Supp. 1400, 1406 n.10 (1971) (citation omitted), *aff'd*, 60 CCPA 123, C.A.D. 1094, 475 F.2d 1189 (1973). Thus, an affirmative determination can only be made if, upon a review of the entirety of the record, there is substantial evidence to support a conclusion that subject imports are a cause of present material injury such that the imposition of remedial duties is warranted to afford prospective relief to the domestic industry which would otherwise experience further injury due to the continued importation of unfairly traded merchandise.

Although the entirety of the administrative record must be evaluated, a finding of "present" injury must reference a time period which is as nearly contemporaneous to vote day as possible and for which reliable record evidence is available. This is not to say that the ITC may not exercise its discretion in choosing the most appropriate time frame for its investigation. *See Kenda Rubber Indus. Co. v. United States*, 10 CIT 120, 126–27, 630 F. Supp. 354, 359 (1986). Nor does the court mean to preclude the ITC from addressing the possibility that negative effects of a present material injury are latent. *Saarstahl AG v. United States*, Consol. Court No. 93–04–00219–S, Slip Op. 94–103 at 11 (CIT June 24, 1994). The court merely observes that, within the time frame established by the ITC for its investigation, relatively older information serves to provide a historical frame of reference against which a "present" (i.e. as recent to vote day as possible, given the limitations of the collected data) material injury determination is to be made, and without which any assessment of the extent of changed circumstances would be impossible. Indeed, the ITC has previously acknowledged as much. *See 12-Volt Motorcycle Batteries From Taiwan*, USITC Pub. No. 2213 at 11, Inv. No. 731–TA–238 (Final) (Aug. 1989) ("[T]he time period for which we collect data—three years in most cases—merely serves as a historical frame of reference for an analysis of the current condition of the domestic industry at the time of the Commission's determination.").

[23] In 1989, subject imports averaged over 900,000 kilograms per month. In January 1990, subject import volume declined to approximately 779,000 kilograms, rising again to approximately 977,000 kilograms by April 1990. Thereafter, monthly subject import volume declined rapidly to 188,000 kilograms by the end of December 1990. As of April 1, 1991, almost no Norwegian salmon was entering the U.S. market. *ITC Remand Results (Dissent)* at 2 n.6.

imports of Norwegian salmon throughout 1990.[24] Nor does the plurality explain, after taking into account the imposition of provisional duties, how increasingly expensive subject imports depressed and suppressed prices for domestic like product so as to cause present material injury. With these concerns in mind, the court turns to the analysis of price effects found in Acting Chairman Brunsdale's original dissenting opinion, which was adopted in part by the three dissenting Commissioners upon remand.[25]

Commissioner Brunsdale found that the domestic supply elasticity is close to zero; such an inelastic supply implies that the principal effect of unfairly traded subject imports will be to depress or suppress prices for domestic like product, rather than to decrease the domestic industry's sales volume. *April 1991 ITC Determination* at 27–28 (Acting Chairman Brunsdale, dissenting). Thus, relatively older record evidence supports a determination that at one time subject imports did depress and suppress prices. Subsequent events, however, must also be taken into account. Commissioner Brunsdale made four additional findings worthy of note: (1) the elasticity of demand for Atlantic salmon is approximately –2.5; (2) the elasticity of substitution between Norwegian and domestic salmon is roughly 6; (3) the elasticity of substitution between Norwegian salmon and non-subject imports is also approximately 6; and, (4) the elasticity of substitution between domestic salmon

---

[24] The following tables summarize comparable monthly average wholesale market prices for fresh Atlantic salmon:

| Month | Norway 2–3 kg. | Domestic & Canadian 4–6 lbs. | Difference |
|---|---|---|---|
| July 1990 | $ 3.66 | $ 3.53 | $ 0.13 |
| Aug. 1990 | $ 3.80 | $ 3.28 | $ 0.52 |
| Sep. 1990 | $ 4.15 | $ 3.40 | $ 0.75 |
| Oct. 1990 | $ 4.03 | $ 3.33 | $ 0.70 |
| Nov. 1990 | $ 3.89 | $ 3.29 | $ 0.60 |
| Dec. 1990 | $ 3.85 | $ 3.25 | $ 0.60 |
| Jan. 1991 | $ 8.85 | $ 3.13 | $ 0.72 |

| Month | Norway 3–4 kg. | Domestic & Canadian 6–9 lbs. | Difference |
|---|---|---|---|
| July 1990 | $ 4.05 | $ 3.90 | $ 0.15 |
| Aug. 1990 | $ 4.21 | $ 3.78 | $ 0.43 |
| Sep. 1990 | $ 4.49 | $ 4.03 | $ 0.46 |
| Oct. 1990 | $ 4.45 | $ 3.84 | $ 0.61 |
| Nov. 1990 | $ 4.45 | $ 3.50 | $ 0.95 |
| Dec. 1990 | $ 4.45 | $ 3.25 | $ 1.20 |
| Jan. 1991 | $ 4.45 | $ 3.33 | $ 1.12 |

| Month | Norway 4–5 kg. | Domestic & Canadian 9–11 lbs. | Difference |
|---|---|---|---|
| July 1990 | $ 4.25 | $ 4.10 | $ 0.15 |
| Aug. 1990 | $ 4.36 | $ 4.02 | $ 0.34 |
| Sep. 1990 | $ 4.75 | $ 4.25 | $ 0.50 |
| Oct. 1990 | $ 4.66 | $ 4.09 | $ 0.57 |
| Nov. 1990 | $ 4.70 | $ 3.97 | $ 0.73 |
| Dec. 1990 | $ 4.70 | $ 3.45 | $ 1.25 |
| Jan. 1991 | $ 4.70 | $ 3.43 | $ 1.27 |

*AR List 1*, Doc. No. 121, Appendix 12. The president of Connors Aquaculture, Inc., a firm with major operations in both the United States and Canada, testified that there is no difference in the price obtainable for U.S. and Canadian like product when the same sizes are available in each country. *See Plaintiffs' Reply Brief on Remand* at 25 n.55.

[25] Upon remand, Commissioners Brunsdale and Crawford adopted then Acting Chairman Brunsdale's original dissenting opinion in its entirety. Vice Chairman Watson joined his colleagues in adopting Acting Chairman Brunsdale's dissenting opinion, with the exception of its discussion of present material injury and lingering effects. *ITC Remand Results (Dissent)* at 1–2 & n.4.

and non-subject imports is in a range from 6 to 10. *Id*. at 26–30. The high sensitivity of consumers to changes in the price of Atlantic salmon means that the volume of salmon sold in the U.S. market will vary greatly as a function of price. The high degree of substitutability between domestic like product, Norwegian salmon, and non-subject imports, means that any price disparity will likely result in reduced sales of the relatively more expensive product. The degree of substitutability between subject and non-subject imports is critical to an assessment of whether subject imports cause or threaten material injury to a domestic industry, particularly where: the subject merchandise is highly fungible; non-subject imports represent a significant share of the domestic market relative to subject imports; subject imports are relatively more expensive in comparison to non-subject imports; and, domestic consumers are highly sensitive to price.[26] All four criteria are present in this case.

The parties all agree that Atlantic salmon is a highly fungible product. In addition, by the end of 1990, total imports of Atlantic salmon from Canada and Chile exceeded those from Norway.[27] By the time the ITC rendered its final determination in April 1991, there was almost no Norwegian salmon entering the domestic market. *April 1991 ITC Determination* at 24 (Acting Chairman Brunsdale, dissenting); *ITC Remand Results (Dissent)* at 2 n.6. Norwegian salmon that did enter the domestic market in the latter half of 1990 and early 1991 was sold at significantly higher prices, relative to both domestic like product and non-subject imports.[28] Based upon the high degree of substitutability between Atlantic salmon of various sources and the high price sensitivity of domestic consumers, one would expect the sales volume of the relatively more expensive subject imports to plummet; in fact, this expectation is borne out by record evidence. The domestic industry, however, did not take advantage of this retreat of the Norwegian supply from the domestic market. Instead, record evidence shows that the largest beneficiaries were producers of non-subject imports, particularly from Chile and

---

[26] The court is careful to note that the degree of substitutability between subject and non-subject imports is relevant only to a determination of whether subject imports are "a" cause of present material injury. The causation prerequisite to an affirmative injury determination is satisfied if subject imports are shown to be more than a *de minimis* factor in contributing to conditions of present material injury. *Maine Potato Council v United States,* 9 CIT 293, 299, 613 F. Supp. 1237, 1243 (1985). Subject imports need not be the sole cause, nor even the major cause, of such injury. *See British Steel Corp. v. United States,* 8 CIT 86, 96–97, 593 F. Supp. 405, 413 (1984). Once causation of present material injury is established, the ITC is not required to weigh the extent of injury from subject imports against the extent of injuries from other causes if there be any; indeed, once causation is established, the existence of other contributing causes is immaterial. *Atlantic Sugar, Ltd. v. United States,* 2 CIT 18, 24, 519 F. Supp. 916, 922 (1981); *see also United States Steel Group v. United States,* Slip Op. 94–201 at 46–48 (CIT Dec. 30, 1994) (discussing and contrasting two-step versus one-step causation analysis by the ITC).

[27] The following summary of Atlantic salmon import volumes is drawn from Appendix A to the ITC's original determination:

| Source | Quantity (1,000 kg.) | | | |
|---|---|---|---|---|
| | 1987 | 1988 | 1989 | 1990 |
| Norway | 7610 | 8895 | 11,396 | 7699 |
| Canada | 700 | 1137 | 2958 | 4889 |
| Chile | 42 | 118 | 557 | 4077 |

*April 1991 ITC Determination* at A–43.

[28] *See supra* note 24; *infra* note 29.

Canada. Record evidence also shows that any pricing pressure experienced by the domestic industry at the time the ITC rendered its final determination was in no way caused by Norwegian salmon, but rather by such non-subject imports.[29]

It is this development of other nations replacing Norway as significant sources of Atlantic salmon which precludes a finding that subject imports are a present cause of price depression or suppression in this case. The ITC plurality's position, that early record evidence of price depression and suppression can support an affirmative finding of present material injury despite the fact that the most recent reliable record evidence belies a causal connection between subject imports and such price effects, is simply untenable. In other words, the ITC may not base an affirmative finding of present material injury solely upon early record evidence that imports cause injury where, as here, the most recent reliable record evidence demonstrates that, due to changed circumstances, subject imports are no longer a cause of such injury. Consequently, in light of substantial record evidence of changed circumstances in this case, the court finds that the plurality's remand determination that subject imports are a present cause of price depression and suppression for domestic like product is not supported by substantial evidence in the record and thus cannot be sustained.

3. *Impact of Subject Imports on Domestic Producers:*

In evaluating the impact of subject imports on the domestic industry, the ITC is instructed to consider all relevant economic factors which have a bearing on the state of the industry in the United States.[30] In *Salmon I,* the court found that the examples cited by the ITC as evidence of a negative impact on the domestic industry appeared instead to be lingering effects of an injury which occurred in 1989. *Salmon I,* 16 CIT at 955. The court further noted that evidence that the effects of past injury

---

[29] As noted, Canadian salmon generally fetched the same price as domestic like product. *Supra* note 24. The following table summarizes monthly average wholesale market prices for fresh Atlantic salmon from Chile, in dollars per kilogram:

| Month | Chilean 2–3 kg. | Chilean 3–4 kg. | Chilean 4–5 kg. |
|---|---|---|---|
| July 1990 | $ 3.20 | $ 3.85 | $ 4.08 |
| Aug. 1990 | * * * | $ 3.96 | $ 4.12 |
| Sep. 1990 | $ 3.40 | $ 4.08 | $ 4.24 |
| Oct. 1990 | $ 3.38 | $ 3.85 | $ 4.13 |
| Nov. 1990 | $ 3.29 | $ 3.48 | $ 3.78 |
| Dec. 1990 | $ 3.25 | $ 3.25 | $ 3.45 |
| Jan. 1991 | $ 3.06 | $ 3.25 | $ 3.38 |

*AR List 1,* Doc. No. 121, Appendix 12. A comparison of prices for Chilean salmon with prices for domestic and Canadian salmon shows roughly equivalent pricing during these months. *See supra* note 24. In light of domestic consumers' high price sensitivity and of the high elasticities of substitution for this highly fungible product, the record is devoid of substantial evidence that significantly diminishing volumes of relatively more expensive subject imports continued to have any depressive or suppressive effect on domestic prices. *See id.*

[30] These factors include, but are not limited to:

    **(I)** actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
    **(II)** factors affecting domestic prices,
    **(III)** actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment, and
    **(IV)** actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the like product.
19 U.S.C. § 1677(7)(C)(iii) (1988). The ITC is further instructed to consider all relevant economic factors within the context of the business cycle and conditions of competition that are distinctive to the affected industry. *Id.*

continue to be felt by the domestic industry does not compel the immediate conclusion that subject imports are a cause of present material injury. *Id.* at 956. On remand, the ITC plurality continued to find that subject imports had actual and potential negative effects on the domestic industry in this case. *ITC Remand Results* at 18.

The term "material injury" is defined by statute to mean "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (1988). Situations where past sales of subject imports may create or threaten present material injury include instances in which such sales establish an exclusive channel of distribution through which unfair imports enter the domestic market, or where domestic producers continue to experience credit and financing difficulties due to future uncertainty.[31] As the court has previously discussed, the present material injury inquiry requires the ITC to determine whether the domestic industry has experienced such injury by reason of subject imports during the most recent period for which reliable record evidence is available. Thus, as a matter of law, any adverse lingering effects of past material injury, which are not themselves a source of present material injury to the domestic industry, are insufficient to support an affirmative injury determination.

In its remand determination, the ITC plurality addressed several examples of the adverse effect subject imports had on the ability of the domestic industry to raise capital and investment in 1990. The most prominent example cited by the plurality is the liquidation of what had been the largest domestic producer of like product, i.e. Ocean Products, Inc. ("OPI"). *ITC Remand Results* at 18–19. At the time OPI ceased operations and sold its fixed and swimming assets to Connors Brothers, Inc., [                    ]. *ITC Remand Results* at 19. The plurality determined that [                    ] was due in part to the fact that OPI was unable to obtain the price for its assets that it had originally sought. *Id.* Testimony offered at the public hearing by a representative of Connors Brothers supports the plurality's determination that past sales of Norwegian salmon were a source of future uncertainty in the industry, such that OPI stockholders were adversely affected. *Id.* A second example cited by the plurality is the testimony of one U.S. producer that past sales of subject imports created a negative investment climate throughout 1990 (and beyond) which caused his company to experience *current* difficulties in raising capital and obtaining financing. *Id.* at 19–20. Another U.S. producer reported similar problems. *Id.* at 20 n.79 (citation omitted). Plaintiffs dismiss this and other corroborating evidence in the record as mere "self-serving statements from selected petitioning domestic producers * * *." *Plaintiffs' Brief on Remand* at 26. The fact remains, however, that this evidence is consistent, and it is uncontroverted in the record. Consequently, because the record demonstrates that the lingering effects of past sales of unfairly

---

[31] *See ITC Remand Results (Dissent)* at 14 n.37.

traded Norwegian salmon are presently causing an adverse impact on the domestic industry, the court finds that the plurality's conclusion that subject imports negatively affected the domestic industry is supported by substantial evidence in the record and is in accordance with law. The plurality's remand determination is therefore sustained in this regard.

4. *Summary:*

In sum, the court finds that, on the particular facts of this case, the ITC plurality's determination that the most recent record evidence merits diminished weight is unsupported by substantial evidence on the record; rather, substantial record evidence supports the inclusion of this data in an assessment of whether the domestic industry suffers present material injury due to subject imports. In addition, the court finds that the plurality's determinations that: (1) the 1987–1989 increase in the volume of subject imports is significant, and (2) that subject imports are a current cause of price depression and suppression for domestic like product, are similarly unsupported by substantial evidence in the record. Nevertheless, based upon the entirety of the record, and particularly upon the significant absolute volume of subject imports during the POI and uncontroverted record evidence that the lingering effects of past sales of Norwegian salmon continue to adversely impact the domestic industry, the court finds that the plurality's affirmative injury determination is supported by substantial record evidence and in accordance with law. The ITC's affirmative injury determination on remand is therefore sustained.

B. *Commerce's Final AD and CVD Determinations*

Plaintiffs raise various challenges to the final antidumping and countervailing duty determinations rendered by Commerce. Commerce published notice of the results of its final antidumping and countervailing duty determinations regarding Norwegian salmon on February 25, 1991. 56 Fed. Reg. at 7661, 7678. As noted, the ITC's final affirmative injury determination was issued on April 1, 1991. Commerce published notice of the resulting antidumping duty and CVD orders on April 12, 1991. 56 Fed. Reg. at 14,920, 14,921. On May 22, 1992, Commerce published notice that it had received timely requests from two of the respondents, i.e. Skaarfish and Salmonor, for an administrative review of its antidumping duty order for the period October 3, 1990 through March 31, 1992. 57 Fed. Reg. at 21,769. Salmonor subsequently withdrew its request for review on June 25, 1992. Commerce published the preliminary results of its review as to Skaarfish on April 2, 1993. 58 Fed. Reg. at 17,380–81. Notice of the final results of this administrative review were published on July 14, 1993. 58 Fed. Reg. at 37,912.

On May 27, 1993, Commerce published notice that The Coalition for Fair Atlantic Salmon Trade ("FAST") had timely requested a second administrative review of Commerce's antidumping duty order regarding subject imports. 58 Fed. Reg. at 30,767. The review covered eighty-

five exporters including all of the respondents investigated in the original LTFV investigation, and the review period was from April 1, 1992 through March 31, 1993. *Id.* at 30,767–69. Notice of Commerce's preliminary results was published on December 14, 1993.[32] 58 Fed. Reg. at 65,333. On March 16, 1994, Commerce published notice of the final results of this administrative review. 59 Fed. Reg. at 12,242.

On May 12, 1994, Commerce published notice that it had received timely requests for a third administrative review of the antidumping duty order regarding imports of Norwegian salmon. 59 Fed. Reg. at 24,683. The period of this review is April 1, 1993 through March 31, 1994. *Id.* at 24,684. Commerce published notice of partial termination of this administrative review on September 16, 1994. 59 Fed. Reg. at 47,610. The preliminary results of this review have yet to be published. Lastly, with regard to its final countervailing duty determination, Commerce has not yet received any requests for administrative review of its CVD order.

## 1. *The Viability of Plaintiffs' Claims:*

Commerce is authorized to conduct administrative reviews of antidumping and countervailing duty orders pursuant to 19 U.S.C. § 1675 (1988). According to statute, at least once during each twelve month period beginning on the anniversary of the date of publication of a countervailing or antidumping duty order, upon receiving a timely request for administrative review, Commerce shall review and determine the amount of any net subsidy and any antidumping duty. 19 U.S.C. § 1675(a)(1). The final results of such a review provide the basis for assessing antidumping and countervailing duties on entries made during the period of review,[33] as well as for the deposit of estimated duties to be made on subsequent entries of subject imports. 19 C.F.R. §§ 353.22(c)(10), 355.22(c)(10) (1994). If no review is requested, Commerce will instruct Customs to assess antidumping and countervailing duties on subject imports entered or withdrawn during the prior period at rates equal to the cash deposit of, or bond for, estimated duties required on that merchandise at the time of entry or withdrawal from warehouse for consumption, and to continue to collect the cash deposits previously ordered. 19 C.F.R. §§ 353.22(e)(1), 355.22(g)(1).

---

[32] Because FAST timely withdrew its request for administrative review of Skaarfish on August 25, 1993, Commerce terminated its review accordingly. Skaarfish's entries were therefore liquidated at the rate at which they were entered, and estimated duties on Skaarfish's subsequent entries continue to be assessed in accordance with the final results of Commerce's first administrative review of Skaarfish. 58 Fed. Reg. at 65,333–34.

[33] For requests received during the first anniversary month after publication of an antidumping duty order, the review covers, as appropriate, entries, exports, or sales during the period from the date of suspension of liquidation to the end of the month immediately preceding the first anniversary month. 19 C.F.R. § 353.22(b)(2). For requests received in subsequent anniversary months, the review normally covers, as appropriate, entries, exports, or sales of the merchandise during the twelve months immediately preceding the most recent anniversary month. 19 C.F.R. § 353.22(b)(1).

For requests received during the first anniversary month after publication of a countervailing duty order, the review covers entries or exports, as appropriate, during the period from the date of suspension of liquidation to the end of the most recently completed reporting year of the government of the affected country. 19 C.F.R. § 355.22(b)(2). For requests received in subsequent anniversary months, the review normally covers entries or exports of the merchandise during the most recently completed reporting year of the government of the affected country. 19 C.F.R. § 355.22(b)(1).

Thus, under normal circumstances, following the anniversary month of publication of an AD or CVD order, entries made during the prior period are liquidated with duties assessed in accordance with either the final results of an administrative review of the underlying order, or at a rate equal to the estimated duties required on the merchandise at the time of entry or withdrawal from warehouse for consumption if no review is requested.[34] The statute also provides, however, that interested parties may seek to enjoin liquidation of entries subject to an AD or CVD order upon a proper showing before this court that the requested relief should be granted under the circumstances. 19 U.S.C. § 1516a(c)(2) (1988); *see Zenith Radio Corp. v. United States,* 1 Fed. Cir. (T) 74, 76, 78, 710 F.2d 806, 808–09, 810 (1983) (the consequences of liquidation constitute irreparable injury sufficient to require the trial court to consider all appropriate factors in deciding whether to grant an injunction). Significantly, unless liquidation is so enjoined, entries made prior to the anniversary month of publication of an AD or CVD order are liquidated in accordance with either the original order or the final results of an administrative review of such order, notwithstanding the fact that there may be an outstanding challenge to such order pending before this court. Moreover, liquidation renders moot any pending court challenge to the underlying agency determinations regarding those entries, for the statutory scheme does not authorize this court to order a reliquidation of entries once they are liquidated in accordance with either an outstanding AD or CVD order, or the final results of an administrative review of such order. *Zenith Radio Corp.,* 1 Fed. Cir. (T) at 78, 710 F.2d at 810; *Ceramica Regiomontana, S.A. v. United States,* 7 CIT 390, 396, 590 F. Supp. 1260, 1265 (1984).

Consequently, if liquidation occurs prior to the completion of judicial review of an AD or CVD determination, and duties are assessed pursuant to either the original order or the final results of an administrative review of such order, any outstanding challenges to the AD or CVD determination are rendered moot as to the liquidated entries because such entries are no longer amenable to the reach of this court. Furthermore, if the final results of an administrative review of an AD or CVD order are published, any outstanding challenges to Commerce's underlying AD or CVD determination are similarly rendered moot as to *subsequent* entries of the subject merchandise, because estimated duties are to be assessed on such entries in accordance with the final results of the administrative review and *not* Commerce's original AD or CVD order.[35] *See, e.g., PPG Indus., Inc. v. United States,* 11 CIT 303, 309, 660 F. Supp.

---

[34] If, however, an agency determination is contested pursuant to 19 U.S.C. § 1516a(a), then such liquidation will occur only as to those entries which are entered or withdrawn from warehouse for consumption on or before the publication date of a notice of a decision of this court or of the Court of Appeals for the Federal Circuit which is not in harmony with the agency determination. 19 U.S.C. § 1516a(c)(1) (1988). Subsequent entries are liquidated in accordance with the final court decision in the action, as are any entries the liquidation of which has been enjoined by court order. 19 U.S.C. §§ 1516a(e), 1516a(c)(2).

[35] Interested parties may separately challenge the results of an administrative review in this court pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(I), (B)(iii) (1988).

965, 970 (1987); *Silver Reed Am., Inc. v. United States,* 9 CIT 221, 224 (1985).

In this case, plaintiffs failed to obtain a § 1516a(c)(2) injunction against liquidation of the entries covered by the original AD and CVD orders. As a result, because Commerce has published notices of the final results of its two administrative reviews of the antidumping duty order covering imports of Norwegian salmon, plaintiffs' various challenges to Commerce's final antidumping determination are rendered moot and must therefore be dismissed. Plaintiffs' challenge to Commerce's final CVD determination is similarly rendered moot as to those entries that have been liquidated; however, because Commerce has yet to receive a request for administrative review of its CVD order, that order continues to provide the basis for assessing estimated CVDs on imports of Norwegian salmon. Because plaintiffs' claim raises a live controversy over the magnitude of estimated CVDs to be assessed, the court turns to an examination of plaintiffs' challenge to Commerce's final CVD determination.

### 2. *Commerce's CVD Determination:*

On February 15, 1991, Commerce reached a final determination that certain benefits, which constitute subsidies within the meaning of the countervailing duty law, were being provided to producers or exporters in Norway of fresh and chilled Atlantic salmon in the amount of 0.71 Norwegian kroner per kilogram. 56 Fed. Reg. 7678 (Feb. 25, 1991). One element of this net subsidy consisted of loans from the Regional Development Fund ("RDF") and the National Fishery Bank of Norway ("NFB"). Because the loans provided by the RDF were limited to business entities located in specific regions of Norway, they were considered to be countervailable. Similarly, because the loans provided by the NFB were limited to the fishery industry, they were also found to be countervailable. 56 Fed. Reg. at 7679–80.

In each instance, in order to measure the countervailable benefit, Commerce subtracted the interest paid on loans in 1989 from the interest that would have been paid at the rate that Commerce found to be the commercial benchmark rate for 1989. According to Commerce this commercial rate was 15.65 percent, consisting of 14.9 percent, which Commerce found to be the effective long-term interest rate in 1989, plus a risk premium of 0.75 percent. *Id.* Plaintiffs argue that Commerce's decision to include this 0.75 percent risk premium is unsupported by substantial evidence in the record and should be reversed. The court disagrees.

The crux of plaintiffs' argument on this point is semantical. Commerce's verification report for the Christiana Bank states:

> We asked officials what the effective short-term interest rate was for 1989. They estimated that the rate was between 14 and 15 percent. The Bank officials stated that they charge a risk premium of 0.75 percent on all fish farm loans. The risk premiums the Bank

charges other industries vary according to the customer and the nature of the loan.[36]

Plaintiffs argue that because Christiana bank officials spoke of the risk premium in the present tense, while speaking of the 1989 short-term interest rate in the past tense, Commerce could not infer that the bank had charged the 0.75 percent risk premium in 1989. At most, the cited statement is ambiguous about whether the risk premium charged by the Christiana Bank in September 1990 was also being charged in 1989. Commerce clearly directed its question with regard to the bank's lending practices in 1989, and this is the context within which the bank responded. Moreover, plaintiffs ignore the additional record evidence supporting Commerce's inclusion of a risk premium for 1989. The verification report for Den Norske Bank ("DNB") states:

> We asked if DNB provides loan guarantees. We were told that the Bank provides guarantees based on the risk of the applicant. Prior to 1986, the standard guarantee premium charged was two percent per year. Since 1986, the premium has been set on a customer-by-customer basis to reflect the risk of the applicant. Bank officials stated that currently the prime guarantee fee would be about 0.3 percent. Generally, the fish farming industry is charged higher premiums than other customers, since the industry's financial health has been poor. * * * [S]ince March of 1989, the DNB is no longer making loans to new clients involved in fish farming due to the current financial situation of the industry.

*CVD Verification Report* at 33. It is therefore apparent that the general financial ill-health of Norwegian fish farms dates to at least March 1989. Commerce was thus fully warranted in inferring that the risk premium being charged to fish farms by the Christiana Bank in 1990 was also being charged in 1989. Because Commerce's decision to include a 0.75 percent risk premium is supported by substantial evidence in the record and in accordance with law, Commerce's CVD determination is sustained.

### III. CONCLUSION

Upon review of the results of remand to the ITC, the court sustains the plurality's affirmative injury determination. Although the court finds that portions of the plurality's remand determination are unsupported by substantial record evidence, the court concludes that, when viewed in its entirety, the record does contain substantial evidentiary support for the plurality's ultimate conclusion. The ITC's affirmative finding of present material injury is therefore sustained.

The court also finds that Commerce's decision to include a 0.75 percent risk premium in its CVD calculations is supported by substantial record evidence. The court therefore affirms Commerce's final CVD

---

[36] U.S. Dep't of Commerce, *Verification Report for the Government of Norway in the Countervailing Duty Investigation of Fresh and Chilled Atlantic Salmon from Norway* at 32 (Nov. 15, 1990) *(AD Pub. Spool No. 2,* frame 449) *("CVD Verification Report").*

determination. Lastly, with regard to Commerce's final antidumping determination, plaintiffs' various claims have been rendered moot and are, therefore, dismissed. Judgment will be entered accordingly.

874 F. Supp. 1395

SKF USA INC. AND SKF INDUSTRIE, S.P.A., PLAINTIFFS *v.* UNITED STATES, DEFENDANT, AND TORRINGTON CO., AND FEDERAL-MOGUL CORP., DEFENDANT-INTERVENOR

Court No. 92–07–00513

(Dated January 20, 1995)

*Howrey & Simon (Herbert C. Shelley, Alice A. Kipel, Thomas J. Trendl* and *Juliana M. Cofrancesco)* for plaintiffs.

*Frank W. Hunger,* Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice *(Marc E. Montalbine);* of counsel: *Stephen J. Claeys, Dean A. Pinkert, Stacy J. Ettinger* and *Thomas H. Fine,* Attorneys, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for defendant.

*Stewart and Stewart (Eugene L. Stewart, Terence P. Stewart, Wesley K. Caine* and *Myron A. Brilliant)* for defendant-intervenor, The Torrington Company.

*Frederick L. Ikenson, P.C. (Frederick L. Ikenson, Larry Hampel, J. Eric Nissley* and *Joseph A. Perna, V)* for defendant-intervenor, Federal-Mogul Corporation.

## OPINION

Tsoucalas, *Judge:* Plaintiffs, SKF USA Inc. and SKF Industrie, S.p.A. ("SKF"), commenced this action challenging certain aspects of the Department of Commerce, International Trade Administration's ("Commerce" or "ITA") final results of its administrative review concerning antifriction bearings ("AFB") (other than tapered roller bearings) and parts thereof from Italy. *Antifriction Bearings (Other*