# United States Court of Appeals for the Federal Circuit

2007-1036, -1037

CLEO INC. and CRYSTAL CREATIVE PRODUCTS, INC.,

Plaintiff-Appellants,

and

TARGET CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

SEAMAN PAPER COMPANY OF MASSACHUSETTS, INC.,

Defendant-Appellee.

Frederick L. Ikenson, Blank Rome LLP, of Washington, DC, argued for plaintiffs-appellants, Cleo Inc and Crystal Creative Products, Inc. With him on the brief were Larry Hampel and Roberta Kienast Daghir.

Marguerite E. Trossevin, Mayer, Brown, Rowe, & Maw LLP, of Washington, DC, argued for plaintiff-appellant, Target Corporation. With her on the brief were James J. Jochum and Kristy L. Balsanek.

Mark B. Rees, Attorney, Office of the General Counsel, United States International Trade Commission, of Washington, DC, argued for defendant-appellee, United States. With him on the brief were James M. Lyons, General Counsel, and Neal J. Reynolds, Assistant General Counsel for Litigation.

Kathleen W. Cannon, Kelley Drye Collier Shannon, of Washington, DC, argued for defendant-appellee, Seaman Paper Company of Massachusetts, Inc. With her on the brief was David A. Hartquist. Of counsel was Adam H. Gordon.

Appealed from: United States Court of International Trade

Judge Judith M. Barzilay

# United States Court of Appeals for the Federal Circuit

2007-1036, -1037

CLEO INC. and CRYSTAL CREATIVE PRODUCTS, INC.,

Plaintiff- Appellants,

and

TARGET CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

SEAMAN PAPER COMPANY OF MASSACHUSETTS, INC.,

Defendant-Appellee.

———————————————

DECIDED:  September 10, 2007

———————————————

Before RADER, BRYSON, and MOORE, <u>Circuit Judges.</u>

BRYSON, <u>Circuit Judge</u>.

Cleo Inc. and its subsidiary, Crystal Creative Products, Inc., (collectively, "Cleo")

join Target Corporation in appealing a decision of the Court of International Trade.  That

court upheld a determination by the International Trade Commission that imports of bulk

and consumer tissue paper from China are materially injuring the domestic tissue paper industry. Although this case is a complex one that is close on several issues, we are persuaded that the Commission's decision is supported by substantial evidence, and we therefore affirm.

I

This case began with an investigation instituted in response to allegations that imports of tissue paper from China are materially injuring the domestic tissue paper industry. On February 14, 2005, the Department of Commerce issued a final determination that tissue paper from China is being sold at less than fair value in the United States. Notice of Final Determination of Sales at LTFV: Certain Tissue Paper Prods. from the People's Republic of China, 70 Fed. Reg. 7475 (Feb. 14, 2005). Shortly thereafter, the Commission issued its final determination that the domestic industry is being materially injured by the dumped imports. Certain Tissue Paper Products from China, 70 Fed. Reg. 15,350 (Mar. 25, 2005); Certain Tissue Paper Prods. from China, Inv. No. 731-TA-1070B (Final), USITC Pub. 3758 (Mar. 2005). Because the commissioners were evenly divided on the issue, the Commission was deemed by statute to have made an affirmative determination of material injury. 19 U.S.C. § 1677(11). On appeal, Cleo and Target challenge the Commission's material injury determination. Both Cleo and Target are domestic companies that import tissue paper from China.

After the Department of Commerce makes a determination that certain articles under investigation are being sold in the United States at less than fair value, i.e., being "dumped," the Commission must determine whether a domestic industry is being

materially injured or threatened with material injury by the importation of those dumped goods. 19 U.S.C. § 1673. The term "industry" is defined by statute to mean the producers of a "domestic like product," id. § 1677(4)(A), and the term "domestic like product" is defined to mean "a product which is like, or . . . most similar in characteristics and uses" to the relevant imported products, id. § 1677(10). The Commission's determination of what goods constitute "like products" therefore defines the scope of a domestic industry and, in turn, the scope of the Commission's material injury analysis. See Allegheny Ludlum Corp. v. United States, 287 F.3d 1365, 1368 (Fed. Cir. 2002). Commerce's designation of the class or kind of merchandise that is sold at less than fair value does not control the Commission's "like product" determination and therefore does not control its definition of the industry to which its material injury analysis must be applied. Hosiden Corp. v. Advanced Display Mfrs. of Am., 85 F.3d 1561, 1568 (Fed. Cir. 1996). It is thus possible that the class or kind of merchandise identified by Commerce in its less than fair value determination may encompass more than a single domestic industry under the "like product" standard applied by the Commission. Id.

The "like product" determination is a factual issue that the Commission resolves by weighing six factors relating to the products in question: (1) physical characteristics and uses; (2) common manufacturing facilities and production employees; (3) interchangeability; (4) customer perceptions; (5) channels of distribution; and, where appropriate, (6) price. See Torrington Co. v. United States, 938 F.2d 1278, 1280 (Fed. Cir. 1991), (adopting 14 Ct. Int'l Trade 648 (1990)); NMB Sing. Ltd v. United States, 288 F. Supp. 2d 1306, 1313 (Ct. Int'l Trade 2003); Timken Co. v. United States, 913 F. Supp. 580, 584 (Ct. Int'l Trade 1996). When weighing those factors, the Commission

disregards minor differences and focuses on whether there are any clear dividing lines between the products being examined. Nippon Steel Corp. v. United States, 19 Ct. Int'l Trade 450, 455 (1995). The legislative history of the Trade Agreements Act of 1979, which added the "like product" provision, explains that the requirement that a product be "like" the imported article "should not be interpreted in such a narrow fashion as to permit minor differences in physical characteristics or uses to lead to the conclusion that the product and article are not 'like' each other, nor should the definition of 'like product' be interpreted in such a fashion as to prevent consideration of an industry adversely affected by the imports under investigation." S. Rep. No. 96-249, at 90-91 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 476-77.

Once the Commission has defined the domestic industry at issue, it must determine whether that industry is being materially injured by the subject imports. When doing so, the Commission evaluates, among other things, the volume of imports and their effect on the domestic industry. See 19 U.S.C. § 1677(7)(B). "An affirmative injury determination requires both (1) present material injury and (2) a finding that the material injury is 'by reason of' the subject imports." Gerald Metals, Inc. v. United States, 132 F.3d 716, 719 (Fed. Cir. 1997).

In this case, the Commission first considered whether bulk tissue paper and consumer tissue paper constitute a single like product. The Commission defined bulk tissue paper as tissue paper sold in bulk to stores and manufacturers, generally for use in their own businesses to wrap customer purchases. It defined consumer tissue paper as tissue paper sold in packages for retail sale. After evaluating the six like product factors and examining whether there are any clear dividing lines between bulk and

consumer tissue paper, the Commission determined that the two types of tissue paper constitute a single like product for purposes of the material injury analysis.

The Commission then considered whether the domestic tissue paper industry is being materially harmed by reason of the imports of dumped tissue paper. It determined that the volume of tissue paper imports has been steadily and quickly rising at the expense of the domestic industry. It also found that imports have undercut the price of the domestic product, resulting in a significant decline in the health of the domestic industry. Based on those subsidiary findings, the Commission determined that dumped tissue paper is materially harming the domestic industry.

The three dissenting commissioners found that consumer and bulk tissue paper are separate products and therefore analyzed the domestic bulk tissue paper industry and the domestic consumer tissue paper industry separately. They found that the U.S. bulk tissue paper industry was materially injured by reason of imports of bulk tissue paper, but that the U.S. consumer tissue paper industry was not materially injured or threatened with material injury by reason of imports of consumer tissue paper.

Cleo and Target appealed the Commission's determination to the Court of International Trade. They argued (1) that the Commission incorrectly found that bulk and consumer tissue paper are a single like product, (2) that the Commission improperly considered Cleo's and Target's imports in its material injury determination and that its causation analysis was thus flawed, (3) that the Commission erred in concluding that the domestic products were being undersold by the imports, and (4) that the Commission used flawed financial data when concluding that the domestic industry was in poor health. The Court of International Trade rejected those arguments and held

that substantial evidence supported the Commission's material injury determination. Cleo and Target appeal, repeating the arguments they made in the trial court.

II

Like the Court of International Trade, this court reviews the Commission's determination for substantial evidence. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350 (Fed. Cir. 2006), (citing Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1559 n.10 (Fed. Cir. 1984), and 19 U.S.C. § 1516a(b)(1)(B)(i)). When performing a substantial evidence review, however, "we give great weight to 'the informed opinion of the Court of International Trade.' Indeed, it is nearly always the starting point of our analysis." Nippon Steel, 458 F.3d at 1351 (quoting Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 983 (Fed. Cir. 1994)).

The substantial evidence test requires only that there be evidence that a reasonable mind might accept as adequate to support a conclusion. Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951). Although a reviewing court must take into account contradictory evidence or any evidence in the record that undermines the agency's finding, the substantial evidence test does not require that there be an absence of evidence detracting from the agency's conclusion, nor is there an absence of substantial evidence simply because the reviewing court would have reached a different conclusion based on the same record. Id. at 487-88; Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001); U.S. Steel Group v. United States, 96 F.3d 1352, 1357 (Fed. Cir. 1996). Having reviewed the administrative record and the trial court's analysis, we hold that substantial evidence supports the Commission's affirmative material injury determination.

III

The appellants first challenge the Commission's finding that bulk and consumer tissue paper constitute a single domestic like product. They challenge the Commission's subsidiary findings on the factors that bear on the like product inquiry as well as the Commission's ultimate like product determination, which was based on its assessment of those factors. The appellants also argue that the Commission's like product determination is contrary to previous material injury determinations with respect to other industries.

A

In conducting its like product analysis, the Commission found that bulk and consumer tissue paper are similar in physical appearance and use. Both products are made from "jumbo rolls" of tissue paper and both have similar typical end uses, i.e., for wrapping products or gifts. Both types of tissue paper come in a variety of grades, colors, designs, and dimensions. While some consumer tissue paper undergoes special treatment and some bulk tissue paper is cut in special ways, both types are generally sold as solid color sheets. The Commission further found that both types of tissue paper come in a variety of overlapping sizes, although bulk tissue paper is more often sold flat or folded only once. Consumer tissue paper is generally sold folded more than once, but is sometimes sold flat. The Commission noted that while bulk tissue paper is generally sold in large quantities and consumer tissue paper is generally packaged and sold in smaller quantities for retail sale, it is increasingly common for retail sales to consist of larger quantity "club packs" or seasonal packages, and it is increasingly common for smaller retail operations to use those larger packages of

consumer paper to wrap purchases. The Commission thus found that there is no sharp distinction between the physical characteristics and uses of the two products.

Target argues that consumer tissue paper generally comes in more colors than bulk tissue paper, and Cleo argues that the evidence is insufficient to support the Commission's conclusion that the two products come in similar sizes. It is true, as the Commission noted, that there are some differences in the colors available in bulk and consumer tissue paper. In addition, while the evidence cited by the Commission shows that bulk and consumer tissue paper are often sold in similar or identical sizes, Cleo is correct that the evidence also shows that the sizes fail to overlap a significant part of the time. Despite those differences, however, substantial evidence supports the Commission's determination that bulk and consumer tissue paper share the same general physical characteristics.

The Commission also found that the manufacturing and production process is similar for the two types of tissue paper. The evidence shows that both types of tissue paper are made from the same materials and that those companies that produce both bulk and consumer tissue paper manufacture them on the same machines run by the same employees. The appellants point out that fewer than half the domestic tissue paper manufacturers produce both types of tissue paper and that only one domestic manufacturer produces significant quantities of both. That one manufacturer, however, produces a very large percentage of all domestic tissue paper. The appellants also argue that consumer tissue paper is packaged and folded differently from bulk tissue paper. While it is true that the manufacturing steps for the products are not identical, there remains significant overlap in the overall manufacturing process. Thus, the

evidence is sufficient to support the Commission's conclusion that the two products are reasonably similar with respect to their manufacture.

With regard to consumer perceptions and interchangeability, the Commission found the evidence to be mixed. Although some producers, importers, and purchasers perceived the two types of tissue paper to be interchangeable, others did not. A review of the individual responses to the Commission's questionnaires relating to interchangeability supports the Commission's determination that consumer perceptions regarding interchangeability are mixed.

Finally, the Commission found only limited overlap between the types of tissue paper with regard to channels of distribution and price. The evidence shows that, although the distinction has been lessening recently, consumer tissue paper is primarily sold to retailers and then to retail customers, while bulk tissue paper is primarily sold through distributors and then to end-users such as department stores. The evidence also shows that the price of consumer tissue paper is generally higher than the price of bulk tissue paper. The Commission noted, however, that those differences are mitigated somewhat by the fact that there is a modest but significant market for packages containing quantities of tissue paper falling between the traditional sheet counts for bulk and consumer packages. Those seasonal packages and "club packs," according to the Commission, blur the line between the channels of distribution. The pricing of those packages also indicates that the price of tissue paper depends largely on the number of sheets sold in a package. Given that evidence, the Commission's determination that there is some limited overlap between the two types of tissue paper with respect to price and channels of distribution is supported by substantial evidence.

In sum, the Commission reasonably found that there is significant overlap in physical characteristics and uses as well as in the manufacturing process; mixed evidence regarding interchangeability and consumer perceptions; and only limited overlap in channels of distribution and price. While the question on the facts is a close one, a reasonable factfinder applying the Commission's six-factor test could conclude from the evidence before the Commission that bulk and consumer tissue paper are like products, and accordingly that they are sufficiently similar that dumped imports of one type of tissue paper have significant market effects on the other.[1] The fact that a reasonable factfinder might have concluded otherwise does not mean that the Commission's decision was unsupported by substantial evidence. Nippon Steel, 458 F.3d at 1358.

B

The appellants argue that prior determinations by the Commission relating to other kinds of products require that bulk and consumer tissue paper be classified as separate products. They argue that it was arbitrary for the Commission to find those types of tissue paper to constitute a single like product when it has found that particular consumer or retail goods constituted separate products from similar goods produced for industrial or nonconsumer use. They rely principally on the Commission's decision in

---

[1] Contrary to the appellants' contention, we do not perceive that the Commission's like product analysis was biased towards finding that bulk and consumer tissue paper are a single like product in order to conform its finding with the scope of Commerce's less than fair value finding. Although the less than fair value finding is necessarily the starting point of the Commission's like product analysis, see 19 U.S.C. § 1677(10), the Commission cited the settled rule that Commerce's finding does not control the Commission's determination, and we see no sign that the Commission allowed Commerce's finding to shape its like product determination in this case.

Folding Gift Boxes from China, Inv. No. 731-TA-921 (Final), USITC Pub. 3480 (2001), which involved gift boxes sold to stores to give to their customers and gift boxes sold to merchants for resale.

As the trial court explained, each injury investigation by the Commission "is sui generis, involving a unique combination and interaction of many economic variables." Nucor Corp. v. United States, 414 F.3d 1331, 1340 (Fed. Cir. 2005). For that reason, prior determinations by the Commission with regard to one industry typically provide little guidance for later determinations with regard to different industries. Each of the prior Commission determinations on which the appellants rely involved significantly different facts. In its decision in this case, the Commission specifically distinguished the Folding Gift Boxes case, explaining that the production process for the two types of gift boxes was different and that storage and warehousing requirements differed between the two types of gift boxes in ways not present in the tissue paper industry. The Commission also noted that nothing in the gift box market blurred the distinction between the two products in the way that club packs and other large-count formats did for the tissue paper market. Although the Commission in each of the cases on which the appellants rely found that the domestic industry was not materially injured by dumped imports, we discern nothing in those cases that reflects an inconsistent application of legal standards by the Commission. The differences in outcome thus do not indicate that the Commission either committed legal error in the methodology it used in this case or departed from the mode of analysis it regularly employs in material injury investigations.

IV

The appellants also challenge the Commission's determination that the dumped imports are causing material injury to the domestic tissue paper industry. The Commission found that the volume of dumped tissue paper from China increased sharply over the period examined and that the price of the imported paper significantly undercut the price of domestically produced paper during that period. Those factors, the Commission found, led to a dramatic transfer of market share from the domestic producers to the importers, which in turn resulted in a decline in the health of the domestic tissue paper industry. The appellants assert that the Commission overstated the volume of dumped tissue paper imports and that the Commission improperly credited evidence of price undercutting. Cleo also argues that the Commission misinterpreted the financial data relating to the domestic industry and that, when properly analyzed, the data fails to shows that the domestic industry grew weaker during the period examined.

A

The Commission overstated the pertinent volume of dumped tissue paper, according to the appellants, because it impermissibly included Cleo's and Target's imports of consumer tissue paper in the volume calculations for the period examined. They argue that those imports were attributable to economic factors unrelated to the availability of dumped imports and that those imports therefore did not cause injury to the domestic industry. Cleo's argument is as follows: In October 2002, Cleo purchased Crystal, a tissue paper producer, and entered into a supply contract for jumbo rolls with a paper-making company previously related to Crystal. In 2003, however, Crystal

halted production following what Cleo terms a "sudden and unexpected decision" by the paper-making company to renege on its supply contract. Additionally, in 2003 Crystal lost the services of its rotogravure printer. Cleo claims that it could not find adequate replacements for those supplies domestically and therefore was forced to stop production altogether. It contends that increased reliance on imports was necessary to allow Cleo to fulfill its customer's orders. Cleo thus argues that its decreased production and increased reliance on imports was due to supply disruption and not to the availability of low-price dumped imports. For that reason, Cleo contends that the imports attributable to Cleo following its supply disruption must be excluded from the Commission's volume calculations.

Although acknowledging that the disruption of Cleo's supply contributed to its decision to import tissue paper from China, the Commission found that the evidence before it did not support the conclusion that the supply shortage was the primary motivation for that decision. The Commission noted that both Cleo and Crystal were importing significant amounts of tissue paper from China prior to Crystal's acquisition by Cleo and prior to the supply disruption. It also noted that there was a domestic supplier that could have provided Cleo with jumbo rolls of tissue paper and that jumbo rolls could have been imported, but that Cleo elected not to purchase jumbo rolls and instead opted to import finished tissue paper. After considering conflicting testimony about whether sufficient rotogravure printing services or acceptable substitutes were available domestically, the Commission also concluded that there were enough quality domestic printing services to meet Cleo's needs. Moreover, the Commission noted that prior to its acquisition by Cleo, Crystal was investigating the possibility of filing an antidumping

petition covering tissue paper from China. Taking all that evidence into account, the Commission determined that lack of supply was not the primary motivation behind Cleo's increased imports of finished tissue paper.

Cleo argues that any imports by Crystal or Cleo that predated Cleo's acquisition of Crystal are irrelevant because the business model of the combined corporate entity changed at the time Crystal was acquired. In particular, Cleo contends that its decision to purchase a paper manufacturer shows that Cleo did not regard the price of imported goods as a reason to import tissue paper products. While that argument has some appeal, the evidence can also be interpreted, as the Commission did, to indicate that Cleo and Crystal were both interested in taking advantage of lower-priced tissue paper from China. The record contains evidence that Cleo purchased Crystal in large part to obtain Crystal's name and its marketing and distribution facilities, not necessarily for its production capabilities. That view is strengthened by the fact that Cleo did not act to continue its "producer" business model by purchasing jumbo rolls domestically or abroad after encountering supply issues, but instead opted to import all its consumer tissue paper needs from China. The fact that Crystal immediately stopped pursuing an antidumping action when it was purchased by Cleo lends further credence to the Commission's view.

The appellants also argue that the Commission impermissibly substituted its business judgment for Cleo's when it concluded that sufficient supplies of jumbo rolls and printing services were available domestically. The Commission, however, came to its conclusion on supply availability by comparing the testimony of various industry leaders and finding some more credible than others. The Commission's conclusion on

that issue is a factual determination that is amply supported by testimony and other record evidence. In light of that conclusion, the prior imports by Cleo and Crystal, the prior investigation into initiating an antidumping action, and the plausible alternative business motivation for Cleo's decision to rely on imported tissue paper, it was reasonable for the Commission to conclude that Cleo's imports were not solely attributable to a disruption in supply.

In addition to challenging the Commission's inclusion of Cleo's imports in its material injury analysis, the appellants argue that the Commission should have excluded Target's consumer tissue paper imports from consideration. They claim that Target's imports were not based on price but were necessary because the domestic industry failed to meet Target's needs. According to the appellants, Target created a new market for tissue paper by introducing "fully coordinated mix-and-match color programs" for gift bags. The appellants argue that the domestic industry did not have the capacity to provide the "specialized collated presentations and packaging" Target needed for that program and that no domestic producer attempted to meet Target's needs until 2004. Even at that time, the appellants argue, the one producer who made such an offer was unable to qualify because it did not meet Target's internal rules for suppliers. Additionally, the appellants assert that the domestic producer from which Target purchased consumer paper during the relevant period delivered inferior goods, for which Target's senior buyer was forced to issue an exemption from Target's internal gift bag purchasing policy. If the domestic industry could not or would not supply Target's requirements, the appellants argue, the volume of Target's consumer imports

should not be included when determining whether the domestic industry was harmed by dumped tissue paper imports.

The Commission found that, contrary to the appellants' assertions, the domestic industry was able and willing to supply Target's needs. It credited evidence that Target had purchased and was continuing to purchase consumer tissue paper from domestic suppliers despite Target's assertions regarding the quality of the purchased products. The Commission also found that the domestic industry competed for and could produce so-called "specialty paper," a type of consumer paper Target uses in some of its gift bag packages. That evidence is sufficient to support the Commission's conclusion that Target did not import its consumer tissue paper solely because of the domestic industry's unwillingness or inability to satisfy Target's needs.

The Commission noted that even if Cleo's and Target's consumer imports were excluded, there would still be "significant market share gains by subject imports of bulk tissue at the expense of domestic producers," as well as a "sharp drop in profitability of the bulk tissue operations of domestic producers." Our review of the data shows that conclusion to be supported by substantial evidence. Accordingly, the Commission's material injury determination would be supportable even without consideration of the Target and Cleo imports during the period examined.

B

The appellants next argue that the Commission incorrectly interpreted the price data when it concluded that imported tissue paper significantly undercut the domestic industry's prices during the period examined. To evaluate that question, the Commission looked at pricing information for four categories of goods: (1) white

consumer tissue paper, (2) solid color consumer tissue paper, (3) combination color consumer tissue paper, and (4) white bulk tissue paper. The Commission calculated the weighted average price for each category during each quarter for which there was comparison data. The data showed that imports undersold the domestic product in 6 of 15 quarters for the first category, 12 of 13 quarters for the second category, 4 of 4 quarters for the third category, and 11 of 12 quarters for the fourth category.

The Commission also cited evidence that price was usually the most important factor for domestic purchasers, that a great majority of domestic purchasers reported that the Chinese imports were priced lower than the domestic product, and that virtually all responding purchasers reported that they had shifted their buying to Chinese imports since 2001. Based on that evidence, the Commission found that the imported tissue paper was undercutting domestic prices.

The appellants first argue that, based on their contention that the Commission erred in its like product analysis, the Commission should not have considered evidence of underselling in the bulk tissue paper market in determining whether there was underselling in the consumer tissue paper market. Because we have upheld the Commission's like product determination, that argument necessarily fails.

The appellants next challenge the averaged price data, specifically the first, second, and third categories. Cleo contends that the imported tissue paper in the first category undersold the domestic tissue paper in 4 quarters instead of 6. It notes that the average price column of the Commission's report for the first category only goes to two decimal points and that, at that level of generality, there were 4 quarters in which the imported tissue paper undersold the domestic product, 4 quarters in which the price

was equal, and 7 quarters in which imported tissue paper sold at a price higher than the domestic product. The Commission, however, had and used reliable data going beyond two decimal points to arrive at its conclusion that there was underselling in 6 quarters. In the table cited by Cleo, there is also a column reporting the percentage by which the imported tissue paper undersold the domestic tissue paper. That column lists 6 quarters in which the imported tissue paper undersold the domestic product, a conclusion confirmed by examining the raw data in the report. Given the prices involved in this market, even a small price difference can be significant. We therefore reject the appellants' argument that the Commission's finding of underselling in 6 quarters with regard to the first category is not supported by substantial evidence.

The appellants also argue that the data for the second category is fatally deficient because it does not contain proper direct comparisons between domestic and imported tissue paper. The data, however, contains information regarding both domestic and import sales to retailers, and it shows that the imported tissue paper was priced lower than the domestic product in 12 of the 13 quarters for which there is data. Comparing prices for sales to retailers is a fair comparison and one on which the Commission reasonably relied. Nor does the likelihood of volume discounts in the tissue paper industry require this data to be discarded, as the appellants contend. The domestic industry sold more tissue paper to retailers in many quarters, and the price for those quarters was higher than the price of the imported paper.

The appellees agree with the Commission and the appellants that only limited data is available for the third category. Even without the data from the third category, however, the evidence is sufficient to support the Commission's conclusion. Excluding

the third category, the data indicates that imported tissue paper undersold the domestic products in 29 of 41 quarters and, overall, undersold the domestic products by a significant margin. The appellants do not challenge the other price evidence. Accordingly, the Commission's determination that the imported products were undercutting domestic prices is supported by substantial evidence.

C

Finally, Cleo argues that if its imports are removed from the calculations, the data fails to show any decline in the wellbeing of either the domestic consumer tissue industry or the combined domestic consumer and domestic bulk tissue paper industry. We have already held, however, that the Commission's determinations that consumer tissue paper and bulk tissue paper are part of a single industry and that Cleo's consumer imports should be included in the material injury analysis are both supported by substantial evidence. Viewed in light of those determinations, the data for domestic producers of consumer and bulk tissue paper over the period examined supports the Commission's conclusion that the health of the industry has been declining as the volume of subject imports has increased.[2] That data shows, for example, that during the examination period the domestic industry's output fell by 16.8 percent, its capacity utilization fell by 10.5 percent, its domestic shipments fell by 18.3 percent, and its net sales fell by 26.7 percent. In addition, the total wages and number of employees in the

---

[2]      Cleo also argues that there is a defect in the industry data due to the relationship between the timing of one company's fiscal year reporting and that company's purchase of a particular asset. Cleo acknowledges, however, that the Commission obtained corrected data after discovering the deficiency. Because the Commission was aware of that issue and considered the corrected data when concluding that the domestic tissue paper industry is being harmed by subject imports, Cleo's argument on this point fails.

industry declined, the domestic industry's operating profit margins decreased from 6.6 percent to 3.9 percent, and its operating income fell from $8.2 million to $3.6 million. In light of that evidence, and accepting the Commission's underlying determinations regarding the scope of the industry and the justification for including data relating to Cleo in its material injury analysis, we hold that the Commission's material injury determination is supported by substantial evidence and therefore must be sustained.

AFFIRMED.