# United States Court of Appeals for the Federal Circuit

---

**FULL MEMBER SUBGROUP OF THE AMERICAN INSTITUTE OF STEEL CONSTRUCTION, LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, CORNERSTONE BUILDING BRANDS, INC., BLUESCOPE BUILDINGS NORTH AMERICA INC., JINHUAN CONSTRUCTION GROUP CO., LTD., WISON (NANTONG) HEAVY INDUSTRY CO., LTD., SHANGHAI MATSUO STEEL STRUCTURE CO., LTD., YANDA (HAIMEN) HEAVY EQUIPMENT MANUFACTURING CO., LTD., SHANGHAI COSCO KAWASAKI HEAVY INDUSTRIES STEEL STRUCTURE CO., LTD., MODERN HEAVY INDUSTRIES (TAICANG) CO., LTD., DICKERSON ENTERPRISES, INC., STEEL CONSTRUCTION GROUP, LLC,**
*Defendants-Appellees*

**EXXONMOBIL CHEMICAL COMPANY, A DIVISION OF EXXON MOBIL CORPORATION, GULF COAST GROWTH VENTURES, LLC,**
*Defendants*

---

2022-1176

---

Appeal from the United States Court of International Trade in No. 1:20-cv-00090-CRK, Judge Claire R. Kelly.

---

Decided:  September 7, 2023

---

THOMAS M. JOHNSON, JR., Wiley Rein, LLP, Washington, DC, argued for plaintiff-appellant.  Also represented by STEPHEN JOSEPH OBERMEIER, ALAN H. PRICE, ADAM MILAN TESLIK, ENBAR TOLEDANO, CHRISTOPHER B. WELD.

JOHN DAVID HENDERSON, Office of General Counsel, United States International Trade Commission, Washington, DC, argued for defendant-appellee United States.  Also represented by ANDREA C. CASSON.

DANIEL MARTIN WITKOWSKI, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, argued for defendant-appellees Cornerstone Building Brands, Inc., BlueScope Buildings North America Inc., Jinhuan Construction Group Co., Ltd., Wison (Nantong) Heavy Industry Co., Ltd., Shanghai Matsuo Steel Structure Co., Ltd., Yanda (Haimen) Heavy Equipment Manufacturing Co., Ltd., Shanghai Cosco Kawasaki Heavy Industries Steel Structure Co., Ltd., Modern Heavy Industries (Taicang) Co., Ltd., Dickerson Enterprises, Inc., Steel Construction Group, LLC.  Cornerstone Building Brands, Inc., also represented by MATTHEW R. NICELY.

DANIEL L. PORTER, Curtis, Mallet-Prevost, Colt & Mosle LLP, Washington, DC, for defendant-appellee BlueScope Buildings North America Inc.  Also represented by JAMES BEATY, CHRISTOPHER A. DUNN.

NED H. MARSHAK, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, New York, NY, for defendants-appellees Jinhuan Construction Group Co., Ltd., Wison (Nantong) Heavy Industry Co., Ltd., Shanghai Matsuo Steel Structure Co., Ltd., Yanda (Haimen) Heavy

Equipment Manufacturing Co., Ltd., Shanghai Cosco Kawasaki Heavy Industries Steel Structure Co., Ltd., Modern Heavy Industries (Taicang) Co., Ltd., Dickerson Enterprises, Inc., Steel Construction Group, LLC. Also represented by MAX F. SCHUTZMAN; JORDAN CHARLES KAHN, Washington, DC.

_____

Before REYNA, BRYSON, and CUNNINGHAM, *Circuit Judges.*

REYNA, *Circuit Judge.*

Appellant appeals from the judgment of the United States Court of International Trade that affirms a final negative determination reached by the United States International Trade Commission in an antidumping duty investigation. On March 1, 2020, the Commission issued a final negative determination that the U.S. (domestic) fabricated structural steel ("FSS") industry was not materially injured or threatened with material injury by reason of sales in the United States of certain FSS imports from, among other countries, China. Appellant appealed to the Court of International Trade, raising three principal issues: (1) that the Commission erred by declining to resolve a purported ambiguity in the scope of the investigation in view of the parties' dispute, (2) that the Commission legally erred in its determination that the captive production exception in 19 U.S.C. § 1673d(b)(1)(A)(i) did not apply in the investigation, and (3) that the Commission erred in its price effects analysis under 19 U.S.C. § 1677(7)(C)(ii). The Court of International Trade upheld the Commission's final negative determination, and Appellant appealed to this court. We conclude that the Commission's determination as to the issues raised on appeal is reasonable, supported by substantial evidence, and in accordance with the law. On that basis, we affirm the judgment of the Court of International Trade.

BACKGROUND

Appellant, Full Member Subgroup of the American Institute of Steel Construction, LLC ("AISC"), is an association of U.S. producers and manufacturers of fabricated structural steel ("FSS") products. In February 2019, AISC filed antidumping duty petitions before the United States International Trade Commission ("Commission") and the United States Department of Commerce ("Commerce"), alleging unfair trade practices involving the importation and sales in the United States of FSS from Canada, China, and Mexico. *See* [*FSS*] *from Canada, China, & Mexico*, USITC Inv. Nos. 701-TA-615 and 701-TA-616 (Mar. 1, 2019).[1] This

---

[1]   In general, antidumping duty investigations are commensurately, but separately, conducted by Commerce and the Commission. The object of Commerce's investigation is to determine the extent to which imports of the goods under investigation are sold in the United States at less than fair value, *i.e.* "dumped." *See Cleo Inc. v. United States*, 501 F.3d 1291, 1294 (Fed. Cir. 2007). An early task of Commerce is to define the goods, or merchandise, that are subject to its investigation, the "subject merchandise." *See Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1374–75, 1374 n.2 (Fed. Cir. 2001); *see also* 19 U.S.C. § 1677(25).

The Commission does not investigate whether sales are at less than fair value. Rather, the Commission investigates whether a U.S. industry that produces goods or products that are like the products under investigation by Commerce (these products are referred to as "domestic like product") are materially injured or threatened with material injury. *Cleo*, 501 F.3d at 1294–95.

Central to both investigations, and this appeal, are the agencies' respective definitions or identification of the products under their respective investigation. These

appeal only involves the investigation on FSS imports from China.

On February 4, 2019, the Commission initiated its preliminary phase of its investigation. *See Institution Notice for* [*FSS*] *From Canada, China, & Mexico,* 84 Fed. Reg. 3245 (Int'l Trade Comm'n Feb. 11, 2019). The period of investigation was set for January 2015 through September 2018. [*FSS*] *from Canada, China, & Mexico*, Investigation Nos. 701-TA-615-617 and 731-TA-1432-1434 (Prelim.) at 12, USITC Pub. 4878, (Mar. 2019). The Commission issued questionnaires to, among other entities, the AISC membership, other domestic producers, U.S. importers, and Chinese producers and manufacturers, seeking information and data related to production, shipment, consumption, and pricing of products under investigation during the period of investigation.

---

determinations are critical because they define both the scope of the investigations and the scope of any resulting trade relief, such as the assessment of antidumping duties. *See, e.g.,* 19 C.F.R. § 351.202(b)(5) ("[T]he subject merchandise . . . defines the requested scope of the investigation."); 19 U.S.C. § 1675(a)(2)(C) ("The determination under this paragraph shall be the basis for the assessment of countervailing or antidumping duties on entries of merchandise covered by the determination and for deposits of estimated duties."); *Hitachi Metals, Ltd. v. United States*, 350 F. Supp. 3d 1325, 1341 (Ct. Int'l Trade 2018), *aff'd*, 949 F.3d 710 (Fed. Cir. 2020) ("Commerce's scope rulings assess factors in relation to the foreign like product and subject merchandise produced in the country(ies) subject to investigation, whereas the [Commission's] domestic like product determinations assess factors in relation to the production and sale of domestic like product by the domestic industry.").

The Commission received questionnaire responses providing trade and commercial data, composed of proprietary and business confidential material. *See* [*FSS*] *from Canada, China, & Mexico*, USITC Inv. Nos. 701-TA-615 and 701-TA-616, at *5 (Mar. 1, 2019).

During the preliminary phase of the investigation, the interested parties in the investigation addressed issues pertinent to the methodologies they used for reporting the data, as well as comment and argument regarding the Commission's analysis and treatment of the data. For example, AISC requested that the Commission adopt a domestic like product determination that was coextensive with the subject merchandise definition adopted by Commerce, which expressly excluded pre-engineered metal building systems, or "PEMBs."[2] J.A. 120–21.

Relevant to this appeal, AISC also argued for the Commission to disregard certain data provided by two U.S. producers. According to AISC, NCI Group, Inc. ("NCI") and BlueScope Buildings North America, Inc. ("BlueScope") submitted information for products that were not

---

[2] Commerce defined the subject merchandise scope as "carbon and alloy" FSS that "have been fabricated for erection or assembly into structures, including, but not limited to, buildings." J.A. 2495–96. Commerce's subject merchandise determination provided several categories of exclusions, such as completed PEMBs. J.A. 2496; J.A. 8363–64.

For purposes of this appeal, PEMBs are "defined as complete metal buildings that integrate steel framing, roofing and walls to form one, pre-engineered building system and are designed and manufactured to [meet] Metal Building Manufactures Association guide specifications." J.A. 111. PEMBs "are typically limited in height to no more than 60 feet or two stories." *Id.*

"domestic like products" and thus should be rejected by the Commission. J.A. 8331–33 & n.47. AISC argued, in the alternative, that to the extent that the data were not rejected, the NCI and BlueScope data should be excluded under the captive production provision set out in 19 U.S.C. § 1677(7)(C)(iv). J.A. 8800 & n.180.

On January 30, 2020, Commerce reached a final affirmative determination, concluding that FSS from China was sold in the United States at less than fair value. *Certain* [*FSS*] *from [China]*, 85 Fed. Reg. 5376, 5379 (Dep't of Commerce Jan. 30, 2020).

On March 1, 2020, the Commission issued the final negative determination, concluding that the domestic FSS industry was not materially injured or threatened with material injury by imports of subject FSS from China. [*FSS*] *from Canada, China, & Mexico*, USITC Inv. No. 701-TA-616 (Mar. 1, 2020).[3] The Commission reached the following determination relevant to this appeal.

First, the Commission took steps to exclude purportedly out-of-scope domestic industry data provided by NCI and BlueScope. J.A. 8418 n.304. Second, the Commission determined that the captive production provision was inapplicable because there was no "production of a downstream article," as required by the statute. J.A. 8800–8801. And third, the Commission determined that "[t]he record consequently does not support a finding that the subject imports significantly undersold the domestic like product." J.A. 8415. The Commission also concluded that there was "no evidence of price depression on th[e] record." *Id*.

AISC appealed the Commission's final negative determination to the United States Court of International Trade ("Court of International Trade"). *Full Member Sub. of the*

---

[3]    Three Commissioners voted in the negative and two Commissioners voted in the affirmative.

*Am. Inst. of Steel Constr., LLC v. United States*, 547 F. Supp. 3d 1211 (Ct. Int'l Trade 2021). On appeal before the Court of International Trade, AISC moved for judgment on the agency record based on four arguments: that the Commission erred by (1) failing to exclude NCI and BlueScope domestic industry data related to PEMB material, (2) determining that the captive production provision is inapplicable, (3) failing to seek out additional pricing product data, and (4) concluding that there were no significant price effects by FSS imports. *Id.* at 1218–31.

In September 2021, the Court of International Trade sustained the Commission's final negative determination. *Id.* at 1233. AISC timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

STANDARD OF REVIEW

We review *de novo* the Court of International Trade's judgments on the agency record. *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354 (Fed. Cir. 2005). In doing so, we apply the same standard of review applied by the Court of International Trade when it reviews the Commission's antidumping determinations. *Zhejiang Mach. Imp. & Exp. Corp. v. United States*, 65 F.4th 1364, 1369 (Fed. Cir. 2023). As such, we review whether the Commission's determination is supported by substantial evidence or otherwise not in accordance with the law. *Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1369 (Fed. Cir. 2015). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (cleaned up).

DISCUSSION

On appeal, AISC argues that the Commission erred by (1) declining to resolve a purported ambiguity in the definition of the domestic like product scope, (2) determining that the captive production exception is not applicable, and

(3) concluding that there were no significant price effects by FSS imports.

## I.    Domestic Like Product

We first address AISC's argument concerning the Commission's domestic like product determination. AISC frames this issue as "[w]hether the Commission lawfully declined to resolve an ambiguity in the definition of the domestic like product." Appellant Br. 2. Specifically, AISC asserts that the Commission is required "to resolve whether disputed products in fact met the definition of the domestic like product." Reply Br. 2. AISC further argues that the Commission must "articulate a reason for any such determination" and that the Commission erroneously failed to do so in this case. *Id.*

The domestic like product determination is critical to the framework of antidumping duty investigations. The statute charges the Commission with determining whether a domestic industry is materially injured or threatened with material injury by reason of imports sold in the United States at less than fair value. 19 U.S.C. § 1671(a). To do so, the Commission investigates the economic and commercial health of a domestic industry, defined as "producers as a whole of a domestic like product." *Id.* § 1677(4)(A). The statute defines "domestic like product" as a product "which is like or . . . most similar in characteristics and uses with, the article subject to an investigation." *Id.* § 1677(10). Consequently, whether a U.S. producer is a member of the pertinent domestic industry is determined on the basis of whether it produces a domestic like product. If it does, then the Commission typically seeks data from that company to assist it in gauging whether the domestic industry is injured. If a company does not produce a domestic like product, then it is not part of the relevant domestic industry, and its data is not used in the investigation. *See Pokarna Engineered Stone Ltd. v. United States*, 56 F.4th 1345, 1348 (Fed. Cir. 2023) ("The

term 'industry' is defined in the statute as 'the producers . . . of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product.' 19 U.S.C. § 1677(4)(A).").  To be clear, the Commission does not decide which products or merchandise *are subject to the investigation*, that task belongs to Commerce. *See supra* note 1.

The foregoing is important to understand because AISC's arguments are directed to both the domestic like product and the subject merchandise determinations.  Specifically, AISC frames its argument in terms of the Commission's determination related to the domestic like product, *see* Appellant Br. 22–28, but the core issue AISC raises is more appropriately framed in terms of Commerce's determination related to the subject merchandise.

First, AISC argues that the Commission is legally obligated to redefine the like product definition whenever a dispute arises about whether a product in fact meets the domestic like product definition.  Appellant Br. 2; Reply Br. 2.  AISC asserts that in addition to redefining the domestic like product, the Commission is obligated to articulate a reason for why any disputed product does or does not fall within the domestic like product scope.  Appellant Br. 27; Reply Br. 2.  AISC claims that the Commission erred by not addressing an "ambiguity" in the domestic like product definition because "[i]t does not follow . . . that every piece of fabricated steel in a structure is necessarily fabricated <u>structural</u> steel."  Appellant Br. 28 (citations omitted) (emphasis in original).

We observe that the Commission is not obligated as a matter of law to expressly redefine its domestic like product determination simply because a party disputes whether a particular product falls within the definition.  *See Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 717 (Fed. Cir. 2020) (concluding that Commission was not "required to

compare tool steel to products outside of Commerce's subject merchandise determination"); *cf.* Rules of Practice and Procedure, 63 Fed. Reg. 30,599, 30,602 (Int'l Trade Comm'n, June 5, 1998) ("[T]he Commission may revisit its like product determination when there have been significant changes in the products at issue since the original investigation."). Nor does a purported "ambiguity" require the Commission to modify the domestic like product scope to expressly articulate whether a single or multiple goods are included or excluded from the scope. AISC identifies no regulation, law, or precedent to the contrary—and we find none.

Second, we conclude that the focus of AISC's argument is not the domestic like product definition, but rather the subject merchandise scope. Indeed, AISC concedes that it does not challenge the domestic like product definition on appeal. Reply Br. 2 ("Nor does AISC take issue with the Commission's defining the domestic like product coextensively with the scope, thereby challenging an issue as to which AISC prevailed below."). As a result, we do not address whether the domestic like product definition itself is defective or otherwise ambiguous.

AISC further argues that the Commission's determination is infirm and should be reversed because the Commission included in its investigation certain information and data pertaining to products that did not meet the domestic like product definition. *See* Appellant Br. 25–26. AISC argues that the Commission failed to resolve its argument during the investigation or to articulate the resolution of the issue in its final determination. *Id.* at 26. We disagree.

AISC asserts that the Commission should not have sought and received information and data from two U.S. companies: NCI and BlueScope. According to AISC, the NCI and BlueScope submissions included "significant volumes of non-subject merchandise in their data." *Id.* at 15. AISC asserts that NCI "reported data for complete PEMBs,

which are expressly out-of-scope, and both NCI and BlueScope appeared to have reported data for substantial volumes of *non-FSS components* of PEMBs (meaning [fabricated] steel that was used in a PEMB[], but which AISC did not believe met the criteria for the domestic like product)." *Id.* (emphasis added). AISC notes that the PEMB components at issue on appeal, e.g., insulated metal panels, roof panels, and trim, "were never contemplated as FSS" by the Commission or the parties. Reply Br. 4.

The record belies AISC's argument. As to the purported "complete PEMBs" in NCI and BlueScope's data, AISC's argument hinges on equating "complete PEMBs"—which are the completed buildings—with PEMB kits. J.A. 3741. We disagree with that premise. The Commission concluded that PEMB kits are in scope, and thus were permissibly included in NCI and BlueScope's data. J.A. 8774–76. The record reflects that NCI and BlueScope accordingly did not include complete PEMBs in their data, only kits. *See, e.g.*, J.A. 8801 & nn.186–87; J.A. 3132; J.A. 5345; J.A. 3429

As to the non-structural FSS, the record again runs counter to AISC's argument on appeal. At Commerce, AISC's proposed definition of subject merchandise prevailed. Commerce defined the subject merchandise scope as "carbon and alloy" FSS that "have been fabricated for erection or assembly into structures, including, but not limited to, buildings." J.A. 2495–96. Other parties argued that the FSS scope should be limited to FSS that only "provide structural support" and "can bear certain loads or weight." J.A. 5135. AISC disagreed with that narrowing, arguing that "the scope was not intended to cover only FSS that becomes the structure" or that are "essential to support the design loads of the structure," i.e., load bearing. *Id.* Commerce agreed with AISC. It concluded that the subject merchandise scope had "no limitations regarding whether or not the FSS is essential to support the design loads of the structure." J.A. 5136. As a result, non-load

bearing FSS was included within the subject merchandise scope. This matters because, per AISC's request, the Commission defined the domestic like product as coextensive with the subject merchandise determination. Thus, a decision by the Commission that non-load bearing FSS was within the domestic like product scope is supported by substantial evidence and in accordance with the law.

The record also supports the government's argument that the Commission did not consider out-of-scope data in coming to its final determination, and that the Commission's domestic like product determination was supported by substantial evidence. *See* Appellee Br. 18–24. The Commission conducted a thorough and detailed investigation, including with respect to its domestic like product determination. For example, it issued domestic producer questionnaires to 495 firms and reviewed over 100 questionnaires from domestic producers. J.A. 7969; J.A. 8821–22 n.304. It issued importer questionnaires to 245 firms believed to be importers of FSS. J.A. 7910. The Commission issued a preliminary determination, providing its preliminary analysis of the data and its preliminary domestic like product scope. J.A. 2167–2200; J.A. 2173 (noting that AISC argues the domestic like product scope should be co-extensive with Commerce's subject merchandise scope). Before coming to its final determination, the Commission considered AISC's concerns regarding the out-of-scope data by seeking additional information from producers, J.A. 6612–13; J.A. 8521 n.9, providing instructions on how data should be reported, *see, e.g.*, J.A. 5883–87, and then reviewing that data to ensure they did not include out-of-scope products, J.A. 8821–22 n.304. This record demonstrates that the Commission's investigation was thorough, and that its domestic like product determination is supported by substantial evidence.

The Commission's domestic like product analysis is also in accordance with the law. The Commission—as required by statute, 19 U.S.C. § 1677(10)—properly

considered Commerce's "subject merchandise" determination as the starting point of its domestic like product analysis. *Hitachi*, 949 F.3d at 717 ("The statute requires the Commission to consider Commerce's subject merchandise determination in reaching its own like product determination."); *see, e.g.*, J.A. 8765–71; J.A. 8822 n.304. It then conducted the required six-factor inquiry set out in *Cleo Inc. v. United States*, 501 F.3d 1291, 1294–95, 1298 (Fed. Cir. 2007) to evaluate whether the subject FSS corresponds with a single domestic like product or multiple domestic like products. J.A. 8773–80. Based on Commerce's scope and the *Cleo* inquiry, the Commission similarly concluded that "FSS components of PEMBs" are in scope, and "complete PEMBs" are "excluded from the scope." J.A. 8774. In support of these findings, the Commission relied on evidence related to how FSS and FSS components of PEMBs are produced, J.A. 8775, how they are distributed (e.g., in kits), J.A. 8776, and how they are priced, *id.*

Finally, we are not persuaded that the Commission relied on inconsistent data that corrupted its investigative database. Appellant Br. 2. AISC vaguely contends that the Commission considered "non-structural PEMB components," *id.* at 24, yet does not identify what those precise components are or which data it is referring to. AISC contends that it "did not believe [these components] met the definition of fabricated <u>structural</u> steel." *Id.* (emphasis in original). To the extent that AISC is referring to non-load bearing FSS, that argument fails for the reasons articulated above. Otherwise, its mere belief overturns neither the Commission's thorough investigation nor its analysis and conclusion, which the record establishes is supported by substantial evidence and in accordance with the law.

For the above reasons, we hold that the Commission's domestic like product determination was reasonable, supported by substantial evidence, and in accordance with the law. We find nothing on this record that suggests that the Commission declined to address the issue, or that the

Commission was obligated in this case to redefine the domestic like product scope merely in light of the parties' disagreement.

## II.   Captive Production Provision

We turn to AISC's argument that the Commission erred in determining that the captive production provision under 19 U.S.C. § 1677(7)(C)(iv) is inapplicable. According to AISC, the captive production provision applies because "PEMB producers 'internally transferred' significant quantities of FSS to make PEMBs," which are downstream articles. Appellant Br. 30. We are not persuaded.

Section 1677(7)(C)(iv) provides that:

If domestic producers internally transfer significant production of the domestic like product for the production of a downstream article and sell significant production of the domestic like product in the merchant market, and the Commission finds that—

> (I) the domestic like product produced that is internally transferred for processing into that downstream article does not enter the merchant market for the domestic like product, and

> (II) the domestic like product is the predominant material input in the production of that downstream article,

then the Commission, in determining market share and the factors affecting financial performance set forth in clause (iii), shall focus primarily on the merchant market for the domestic like product.

Generally, the Commission considers the state of the domestic industry as a whole in its injury analysis. *See* 19 U.S.C. § 1673d(b)(1)(A)(i). An exception to this rule is the captive production provision, which provides that, if

certain conditions are met, the Commission must "focus primarily on the merchant market for the domestic like product" when determining market share and assessing economic factors. *See* 19 U.S.C. § 1677(7)(C)(iv). The captive production provision addresses situations in which U.S. producers internally transfer a significant volume of the domestic like product for further internal processing into a separate, distinct downstream article. *See id.* The rationale is that internally transferred domestic like products neither compete with, nor are injured by, the imported merchandise subject to the investigation. When this provision applies, the Commission's investigation excludes pertinent data received from a producer that internally consumes its domestic like product to create a downstream product. *See id.*

A downstream article is an article distinct from the domestic like product but that is produced from the domestic like product. *See* Uruguay Round Agreements Act: Statement of Administrative Action, H. Doc. 103–316, at 852–53 (1994) ("SAA").[4] Thus, the captive production provision does not apply where both domestic like product and the purported downstream article both fall within the domestic like product scope. *See id.*

We conclude that the Commission correctly determined that the captive production provision does not apply here. The Commission reasonably determined that complete

---

[4]    The SAA is an authoritative expression concerning the interpretation and application of the Uruguay Round Agreements Act. 19 U.S.C. § 3512(d); *see* Oral Arg. 29:55–30:21; *see also* Uruguay Round Agreements Act: Statement of Administrative Action, H. Doc. 103–316, at 656 (1994) ("[S]ince this Statement will be approved by the Congress at the time it implements the Uruguay Rounds agreements, the interpretations of those agreements included in this Statement carry particular authority."); J.A. 26 n.15.

PEMBs are fully assembled buildings that are out-of-scope, whereas PEMB kits containing FSS components of PEMBs that are later assembled into complete PEMBs are in scope. *See, e.g.*, J.A. 8371; J.A. 8398; J.A. 8801.  Because both FSS components of PEMBs and PEMB kits are within the domestic like product scope, *see, e.g.*, J.A. 8371; J.A. 8398; J.A. 8801, neither can qualify as a downstream article under the captive production provision, SAA at 852–53.  The only product that could qualify as a downstream article is the complete PEMB, which is out of scope.  Accordingly, as AISC concedes, for the captive production provision to apply here, the producer that produces FSS components of PEMBs (or PEMB kits) must also internally transfer and process those domestic like products to produce the complete PEMB.  *See* Appellant Br. 30–31.  A "producer" must have sufficient product-related activities such that it has a "stake," e.g., it actually makes the product in the domestic industry at issue.  *Pokarna*, 56 F.4th at 1350–51.

Those circumstances, however, do not exist here.  NCI and BlueScope are both FSS and PEMB-kit producers.  *See, e.g.*, J.A. 8334.  But they do not assemble the PEMB kits into complete PEMBs.  Rather, the record establishes that unrelated third parties assemble the FSS components from the PEMB kits to make a building—the complete PEMB.  J.A. 8801 & nn.186–87; J.A. 3132; J.A. 5345; J.A. 3429.  These third-party builders are therefore complete-PEMB producers.  *See* J.A. 5345–46 (referring to builders of PEMB kits as "PEMB builders").  Thus, the Commission properly concluded that the aggregation of components into PEMB "kits," without assembly by a third-party builder to make a complete PEMB, is neither an "internal[] transfer" nor the "production of a downstream article" within the meaning of the captive production under the statute.  J.A. 8397–98 & n.180 (citing 19 U.S.C. § 1677(7)(C)(iv)).

For these reasons, we are unpersuaded by AISC's argument that "the Commission's construction of the statute was arbitrary and not supported by the statute's plain

language" because "the statute imposes no limit on who, in the internal transfer chain, must perform the final production/assembly, nor would such a limitation make sense." Appellant Br. 34. We find no such ambiguity. The SAA is clear on this issue. The term "internally transfer[red]" for the "production of a downstream article" is defined to mean "processed into a higher-valued downstream article *by the same producer.*" SAA at 852 (emphasis added). Because FSS components of PEMBs, PEMB kits, and complete PEMBs are not made by the same producer, there is no internal transfer as required by the captive production provision.

AISC also argues that "the Commission's determination undermines the statute's clear purpose" when it "fixated arbitrarily on the word 'production.'" Appellant Br. 33–34. This argument is forfeited because it was not made before the Court of International Trade. *Full Member Subgroup of Am. Inst. of Steel Constr., LLC v. United States*, 547 F. Supp. 3d 1211, 1225 (Ct. Int'l Trade 2021) ("[AISC] does not contend that the threshold condition is unambiguous or that the Commission's construction of the threshold condition is contrary to the clear intent of Congress."). Absent exceptional circumstances, we will not consider forfeited arguments on appeal. *In re Google Tech. Holdings LLC*, 980 F.3d 858, 863 (Fed. Cir. 2020). AISC offers no argument that exceptional circumstances exist here.

We also find unpersuasive AISC's argument that the Commission's purported inconsistent labeling of certain parties as PEMB producers resulted in a final determination that is unsupported by substantial evidence and not in accordance with the law. AISC points to the preliminary investigation where the Commission generically referred to both PEMB-kit producers and FSS-of-PEMB-components producers as "PEMBs producers." Appellant Br. 33. But there is no dispute that the entities the Commission referenced were not the actual builders that assembled the kits to construct the complete buildings. The Commission's

determination in this regard is supported by substantial evidence.

For the above reasons, we hold that the Commission's determination that the captive production provision is inapplicable is supported by substantial evidence and in accordance with the law.

### III.    Price Effects

AISC argues on appeal that the Commission erred in its determination that the record does not support a finding that imports of FSS from China significantly undersold the domestic like product, or depressed prices of the domestic like product under 19 U.S.C. §§ 1677(7)(C)(ii)(I)–(II). Appellant Br. 32, 38; J.A. 8410–15.

In evaluating the price effects of subject imports, the Commission assesses the impact on domestic like product prices by first establishing whether "there has been significant price underselling by the imported merchandise as compared with the price of the domestic like products." 19 U.S.C. § 1677(7)(c)(ii)(I). If the Commission finds there is significant underselling, it must consider whether "the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree." *Id*. § 1677(7)(c)(ii)(II).

According to AISC, the Commission should have compared initial and final itemized bid data from purchasers and producers instead of relying on pricing data of FSS. Appellant Br. 37–38. AISC claims that where prices were not itemized, the Commission should have collected bid data from the FSS fabricators. *Id*. AISC contends that the Commission's failure to obtain this information rendered the record inadequate and hobbled the Commission's analysis, and as a result, the determination is unsupported by substantial evidence. *Id*. at 40. Alternatively, AISC argues that even on the existing record, the Commission's price

effects determination is not supported by substantial evidence. *Id*. at 43–55.

Specifically, AISC contends that the Commission failed to consider the entirety of the record, and if it had, it would have found significant underselling and price depression. *Id*. at 43–48, 54. AISC claims that any limitation posed by any single data source alone (e.g., total bid data, average unit values ("AUV") data, non-FSS component bid data) could be overcome by weaving together all the various data to find significant underselling. *Id*. at 47. We are not persuaded.

The Commission was not obligated to collect the additional data that AISC points to, especially because the Commission found that data unreliable and unhelpful to the price effects inquiry. Once the Commission satisfies its obligation to conduct investigative activities under 19 C.F.R. § 207.20(b),[5] a decision not to collect additional

---

[5] The regulation states:

> The Director shall circulate draft questionnaires for the final phase of an investigation to parties to the investigation for comment. Any party desiring to comment on draft questionnaires shall submit such comments in writing to the Commission within a time specified by the Director. All requests for collecting new information shall be presented at this time. The Commission will disregard subsequent requests for collection of new information absent a showing that there is a compelling need for the information and that the information

information does not alone render the Commission's final determination unsupported by substantial evidence. *See Hitachi*, 949 F.3d at 718–19. "The Commission does indeed enjoy discretion to conduct its investigation and gather data it deems relevant." *Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1373 (Fed. Cir. 2002). But "[t]here is no statutorily designated minimum standard that requires a particular degree of thoroughness in the Commission's investigation." *LG Elecs., Inc. v. U.S. Int'l Trade Comm'n*, 26 F. Supp. 3d 1338, 1348 (Ct. Int'l Trade 2014). Moreover, "[i]t is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew." *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992). And "[e]ven if it is possible to draw two inconsistent conclusions from evidence in the record" this does not necessarily mean that the Commission's determination is unsupported by substantial evidence. *Am. Silicon Techs. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001).

We hold that the Commission's price effects analysis was reasonable and supported by substantive evidence. After considering product data, overall bid data, itemized bid data, AUV data, and lost sales, the Commission determined that "[t]he record consequently does not support a finding that the subject imports significantly undersold the domestic like product." J.A. 8415. The Commission first found that most FSS is sold in a multi-stage competitive bidding process. J.A. 8404. But the Commission ultimately determined, after requesting additional data, that overall and itemized bid data for these bidding processes was not reliable for several reasons. First, "while there is some correlation between the lowest total bidder and . . .

---

could not have been requested in the comments on the draft questionnaires. 19 C.F.R. § 207.20(b).

the successful bidder, lowest total bids do not always win the sale." J.A. 8410. Second, "the available data concerning total bids do not provide sufficient information to permit [the Commission] to make a conclusion about the relative price levels of the domestic and subject FSS included in the bids." *Id.* Third, it is not possible to "conclude that differences in total bid values necessarily reflect differences in the value of FSS included in the bid." J.A. 8411–12. This is primarily because purchasers do not receive itemized bids that permit assessing the value of any standalone FSS. *Id.*

The Commission also concluded that there was "no evidence of price depression on th[e] record." J.A. 8415. The Commission considered AUVs, cost of goods sold ("COGS"), and raw material costs, but found each data set provided insufficient support to establish price depression. J.A. 8415–17. For example, AUV data showed higher shipments and net sales within the domestic industry. J.A. 8415. As to COGS, the data suggested that "the industry's revenues increased by more than its COGS on both an overall and per-unit basis." J.A. 8415–16. And on raw materials, "the domestic industry as a whole was able to pass on the vast majority of its increases in raw material costs." J.A. 8417. These findings are supported by substantial evidence of no significant underselling and price depression and inform the reasonableness of the conclusion of no injury. We decline AISC's invitation to reweigh the Commission's factual findings.

We hold that the Commission satisfied its obligation under 19 C.F.R. § 207.20(b) to conduct investigative activities and to collect data necessary to conduct its analysis under the statute. It issued questionnaires and sought comment and argument on the best method to evaluate the pricing of the domestic like product. J.A. 8407–08. It then weighed the evidence it received, determined that the additional evidence promoted by AISC would not provide better clarity, and determined that the evidence did not

support a finding of significant underselling or price suppression.  J.A. 8408.  "It is of course well within the [Commission's] discretion to discount or dismiss incomplete or unreliable data."  *Chr. Bjelland Seafoods A/S v. United States*, 19 C.I.T. 35, 54 n.22 (1995).  On this record, the Commission's refusal to seek out additional data as requested by AISC was reasonable and supported by substantial evidence.

The remainder of AISC's arguments are at their core requests for this court to reweigh the evidence, which is outside this court's purview.  *See Trent Tube*, 975 F.2d at 815; *see also Am. Silicon Techs.*, 261 F.3d at 1376.  Again, we decline the invitation to reweigh the evidence considered by the Commission.  Given the Commission's extensive review and analysis of the record, its determination that it lacked sufficient evidence to support a finding of underselling or price suppression is reasonable and supported by substantial evidence.

## CONCLUSION

We have considered AISC's remaining arguments and find them unpersuasive.  For the foregoing reasons, we affirm the judgment of the Court of International Trade.

## **AFFIRMED**

### COSTS

Each party shall bear its own costs.